JOSEPH RAGAN, Administrator, &c. v. NICHOLAS GRAY et al.

In November, 1836, N. G. purchased of J. A. G. a plantation and slaves for the sum of $122,000, of which he paid $20,000 on the 1st of January, 1837, when the possession of the property was delivered, and, for the residue, he (N. G.) executed five promissory notes, each for the sum of $20,400, payable respectively on the 1st of January, 1838, 1839, 1840, 1841, and 1842, and to secure the four last notes, he gave a deed in trust on the property to J. I. G. and N. B., trustees, empowering them, or either of them, in default of payment of any one of the notes, to sell to the highest bidder at public auction for cash, upon thirty days' notice, the property, or so much of it as would be necessary to satisfy the amount due. J. A. G. indorsed the notes due in January, 1839, 1840, and 1841, to said N. B., who afterwards indorsed to D. B., one of the defendants, and said J. A. G. also transferred the note due in 1842 to H., the complainant's intestate; and N. G. having failed to pay the note due in January, 1839, the trustees, on the 8th of January, 1839, advertised the property for sale for its payment; and on the day the sale took place, the said D. B. became the purchaser of the whole property for the sum of $20,400, the amount then due him, and. received a deed from the acting trustee. This was done under an arrangement made on the day of sale by D. B. and N. G. with the consent and advice of J. A. G. and N. B., the trustee, that the other two notes of N. G. due 1st of January, 1840 and 1841, should be delivered up to him and satisfied, and which was done. The bill filed by J. R. as administrator of H., deceased, charges that such arrangement was fraudulent, and the sale void as to his intestate; that the agreement was that N. G. should permit D. B: to purchase the property below its

value, and to that end, biddings were to be suppressed; in consequence of which the property was sold for much less than its market value, and the object of the bill is to set aside the sale and have a resale made of the property, &c. *Held*, that the sale of the property having been made in pursuance of a previous understanding between the parties, there had been a compromise or a settlement between them which was understood by the persons attending the sale, that D. B. was to become the purchaser, and the sale having been made in furtherance of that arrangement, the bystanders declined bidding at the sale; and the circumstances of the sale do not show fraud, or an intention to prejudice the rights of others.

An assignee of a note made under our law, takes it subject to all the equities existing against it in the hands of the assignor. *Held*, that the equity in favor of the appellee (D. B.) against the note as against J. A. G., attached when the note was retransferred to him, and followed it in the hands of the complainant to whom he afterwards transferred it.

ON appeal from the superior court of chancery; Hon. Charles Scott, chancellor.

In November, 1836, Nicholas Gray purchased of John A. Gibson a plantation and the negroes thereon, about fifty in number, for which he agreed to pay $122,000. Of this sum, $20,000 were to be paid in cash on delivery of the place, on the 1st of January, 1837; $20,400 was secured by a promissory note with indorsers, payable the 1st of January, 1838; and four other notes were given for the sum of $20,400 each, payable respectively on the 1st of January, 1839, 1840, 1841, and 1842. These four last notes were not secured by indorsers, but to secure their payment, Gray gave a deed of trust on the property purchased, authorizing the trustees, in default of any payment, to proceed to sell so much of the property as might be necessary. Gray made the cash payment, and also paid the note secured by an indorser, or the greater part of it.

Gibson transferred three of the four last notes to Bryant, the trustee, in payment of a debt, and Bryant transferred them to Barrow, the defendant. Gibson transferred the last note, due in 1842, to E. W. Haring, the plaintiff's intestate. When the first note, or the one due in January, 1839, held by Barrow, became due, Gray failed to pay, and on the 8th of January, 1839, only four days after the maturity of the note, the trustees advertised that they would sell the property on the 9th of Febru-

Ragan *v.* Gray et al.

ary.   On that day Bryant, one of the trustees, (the other not being present,) proceeded to sell the whole property, and Barrow, the holder of the three notes, became the purchaser for exactly the amount then due, to wit, $20,400, and received a deed for the whole property, giving up to Gray, however, in pursuance of a previous agreement, the two other notes held by him, and not due until 1840 and 1841.

This sale Ragan, the complainant, who, as administrator of Haring, is the holder of the last note due, to wit, the 1st of January, 1842, attacks as fraudulent, and claims to have it set aside, or that the property may be held liable for the payment of his note.

The general charge of fraud is in substance this, that Gray and Barrow before the sale, made a compromise and an agreement by which Barrow should become the purchaser of the whole property, and was to give up to Gray the two other notes held by him, and was also to transfer to Gray a certain claim or note for about the sum of seven thousand dollars, and Gray was to permit Barrow to bid off the property at his own price, without offering any opposition, and without inciting persons to bid against him, but to suppress the bidding.   It is charged that this agreement was carried out, and that bidding was suppressed, although many persons wished to bid, and by that means Barrow purchased the whole property, land and negroes, for $20,400, much less than its value, and according to agreement, gave up to Gray the other two notes, and paid him also the seven thousand dollars.

The chancellor decreed in favor of the defendant, and the complainant prayed an appeal to this court.

*Wm. L. Sharkey* for appellee.

It is manifest that Haring was deeply injured by this combination ; the whole of the property on which he had a lien, and at least a chance to realize something from, was swept away. That which only a little over two years before had sold for one hundred and twenty thousand dollars, now, by this arrangement, sold for twenty thousand, and that, too, notwithstanding negroes (as Lynch and others say) had not materially depre-

ciated in price; and the most of the proof shows the land itself to have been worth at that time seven or eight dollars per acre, which (there being 2,040 acres) of itself should almost have paid the debt. It cannot be necessary to argue that such a sale was void. Barrow, by this scheme, acquired a title to all, and but for it he could have acquired only part. In support of my position, I respectfully refer to the following authorities. *Stovall* v. *Farmers and Mechanics Bank*, 8 S. & M. 305; 1 Story, Eq. Jurisp. 310, § 293, 349, 374, and authorities there cited; *Trimble* v. *Turner*, 13 S. & M. 348; 2 Dev. 126.

It should be borne in mind that the property was really sold under a private contract, and Barrow thus got property for two notes not due.

But it is insisted that this sale was void, for the especial reason that Bryant, the trustee and auctioneer, was a party to this contract between Gray and Barrow. The testimony fully establishes this. Barrow states it in his answer. He retired to the room with the parties, urged the parties to make the agreement, was present when it was made, and was interested in having it made, for he was indorser on all the notes held by Barrow, and not indorser on the note held by Haring. By this agreement he was to get rid of his entire responsibility, and this, Gibson says, was Bryant's and his motive, and although bound as trustee to protect Haring's interest, his own interest of course preponderated. It is just such a case as a court of equity will always interfere in to prevent the trustee from making profit by his acts. It was actually a bargain between the auctioneer and a certain person, that that certain person should be the buyer, and he was so; how could it be otherwise? And it is rather strange, that in the sale of so many negroes in different lots, that no other person should have bought one, although others were anxious to buy; or rather it is not strange, under the circumstances, but it is evidence that Bryant, the trustee, was true to his bargain and his interest. For the principle which will here apply, the court is referred to 1 Story, Eq. Jurisp. p. 325, § 307, 308, where it is well laid down, and its application is shown in the several pages immediately succeeding. A trustee is never permitted to make any profit to himself in any of the

concerns of his trust. 1 Story, 507, § 465. Here Bryant did make profit to himself; he discharged his own liability to the prejudice of Haring, his *cestui que trust.*

It was the duty of Bryant to make as little property as possible pay the note; but then Barrow would not have been bound to give up the other notes, because this he only agreed to do in consideration of the whole property. It was Bryant's interest, therefore, that Barrow should get the whole.

Does the statute of limitations protect any of the defendants in this case?

It would, perhaps, be sufficient to remark, that when the payment of a note is secured by mortgage, or, what is the same thing in effect, a deed of trust, that the bar of a suit or remedy on the note will not also bar the separate and distinct remedy on the mortgage or deed of trust. The party in such case has two remedies; he may bring assumpsit on the note, or covenant on the mortgage. *Miller* v. *Trustees of Jefferson College,* 5 S. & M. 651; 2 Ib. 699.

*George Work* for appellees.

The bill alleges that N. Gray, on the 2d of November, 1836, made a deed of trust to Guion and Bryant, trustees, to secure to Gibson four promissory notes of $20,400 each, maturing on the 1st days of January, 1839, 1840, 1841, and 1842, which bore on two thousand and forty acres of land, and about fifty negroes. The deed is exhibited.

The deed provides for the sale of the property as the different instalments fall due. Such are admitted to be its provisions and legal effects by the bill.

The sale for the first note, due the 1st day of January, 1839, held by Barrow, was proper, and he entitled to the proceeds. *Cage* v. *Iler,* 5 S. & M. 410; *Bank of England* v. *Tarlton,* 1 Cushm.

It is admitted by the bill that the property was liable to be sold for the payment of the note falling due on the 1st day of January, 1839, and such is clearly the legal interpretation of the deed of trust, and the law, in the case of instalments due at different times.

The bill alleges and admits that Barrow was, before the sale of the 9th day of February, 1839, the holder and owner of the three notes first due, and that he made an agreement to allow Gray (the debtor) the three notes and $7,000, or $68,200 for the property.

This was evidently more than the value of the property on the 9th day of February, 1839, when it was sold at the trust sale, which was just succeeding the general suspension of the banks.

If the complainant intends to charge fraud in the sale of the 9th of February, 1839, on the defendant Barrow, it is denied that any facts or circumstances are alleged on which fraud can be predicated. It is not sufficient to charge fraud without stating the facts and circumstances in which it consists. *Morton* v. *Granada, &c.*, 8 S. & M. 773. And even proof of fraud without allegation would amount to nothing. So far as the alleged agreement between Barrow and Gray went, it did not prevent the complainant from bidding; the alleged representation in the bill to Gibson, that all the notes were provided for, could be no fraud on the complainant or his intestate. If this was fraudulent representation, it must have been communicated to the party and misled him. Gibson is no party to this suit. The party must be misled, 1 Story, Eq. § 202, and he must be injured by the alleged misrepresentation, Ib. § 203, p. 212. It is therefore reiterated, that the allegations of the complainant do not amount to a charge of legal fraud, and he has no right to the relief sought. Story, Eq. Plead. § 256, and authorities cited in note 1 Probata and Allegata. The property brought more than it was worth, and no person could be injured, and no fraud could be committed. *Hall* v. *Thompson*, 1 S. & M. 444.

But the fraud is denied in the most explicit manner, and the sale proven to be fair and open by Gray, Isaac N. Selser, Dr. Snow, Bailey, Rossman, and Whitehead. Witnesses for complainant do not speak of any word or act of Barrow having the least tendency to prevent bidding. There was no public proclamation of the agreement of Barrow to give up to Gray the three notes.

Barrow denies that he requested Gibson to persuade others

Ragan v. Gray et al.

not to bid at the sale of the 9th of February, 1839. The statute of limitations is pleaded and relied upon in both the original and amended answer, and the complainant, by a special interrogatory, calls on Barrow to state how long he has had possession of the property specified in the deed of trust, and he answers he has had the possession from his purchase on the 9th day of February, 1839, to the filing of his answer on the 20th of April, 1852. This fact is proved by almost every witness in the case, and is contradicted by none. The answer to special interrogatory is evidence for defendant. *Alexander* v. *Wallace*, 10 Yerg. 105; 1 Cow. 111. The possession of the personal property vests an absolute title in Barrow, on which he could recover the property if taken from him. *Thompson* v. *Caldwell*, 3 Littell, 136; *Stanly* v. *Earl*, 5 Ib. 281; *Newberry's Administrators* v. *Blakey*, 3 H. & M. 55; *Brent* v. *Chapman*, 5 Cranch, 358.

*Geo. S. Yerger* on the same side.

*Potter*, for appellant, in reply, reviewed the positions taken and authorities cited by counsel for appellee.

Mr. Justice HANDY delivered the opinion of the court.

The appellant filed his bill in the superior court of chancery, to set aside a sale made under a deed in trust in which he was interested; and the decree being against him, he has brought the case here for revision. The merits of the case will appear from the following statement of the material facts in it.

In November, 1836, Nicholas Gray purchased of John A. Gibson, a plantation and slaves in Hinds county, for the sum of $122,000, of which he paid $20,000 on the 1st of January, 1837, when possession of the property was delivered, and for the residue, executed five promissory notes, each for the sum of $20,400, payable respectively on the 1st of January, 1838, 1839, 1840, 1841, and 1842, and to secure these four last notes, gave a deed in trust on the property to John I. Guion and Nathan Bryant, trustees, empowering them or either of them, in default of payment of any one of the notes, to sell to the highest bid-

der at public action for cash, upon thirty days' notice, the property, or so much of it as would be necessary to satisfy the amount due. Gibson indorsed the notes due in January, 1839, 1840, and 1841, to Bryant for value, who afterwards indorsed them to the defendant Barrow, and Gibson also transferred the note due in 1842 to Herring, the complainant's intestate. Gray failed to pay the note due in January, 1839, and on the 8th of January, 1839, the trustees advertised the property for sale for its payment, to take place on the 9th of February following, and on that day the sale was made of the whole property by Bryant, the other trustee not being present, and Barrow became the purchaser, for the sum of $20,400, the amount then due him, and received a deed from the trustee. This was done under an arrangement made on the day of sale by Barrow and Gray, with the consent and advice of Gibson and Bryant, that the two other notes of Gray due 1st of January, 1840, and 1841, should be delivered up to him and satisfied, which was accordingly done.

The bill charges, that this arrangement was fraudulent and the sale void as to the complainant; that the agreement was, that Gray should permit Barrow to purchase the property below its value, and to that end that the biddings were to be suppressed, and that this agreement was carried out, and by the suppression of the biddings many persons, who were present at the sale and desirous of purchasing the property, or parts of it, were induced not to bid; in consequence of which the property was sold greatly below its market value. The object of the bill is to have the sale set aside and a resale made, and the proceeds thereof applied to the complainant's claim; also, an account of the rents, hire, and profits of the property to the complainant's benefit.

The answers of Gray and Barrow admit the arrangement in regard to the sale as above stated, but deny that there was any agreement that the biddings were to be suppressed. They state that the reason for making this arrangement was, that Gray was about to take legal steps to enjoin the trustee's sale on the ground of defective title to the property in Gibson and fraud practised by Gibson in the sale. Barrow states that, being the

holder of the three notes entitled to priority of payment, amounting to greatly more than what the property would sell for, and Gray, Gibson, and Bryant, being insolvent, and being his only resource for the payment of his debt besides the trust property, he entered into the arrangement and agreed to give up all three of his notes, fearing that if Gray enjoined the sale, the contract might be rescinded and his entire debt lost. Barrow states that Gibson was a party to the arrangement and active in effecting it and was present at the sale, and that he had no knowledge that Gibson had transferred the note to Herring. He denies that the complainant has any title to it, and avers that Gibson was the owner of it after the trustee's sale. He denies all fraud on his part, and also relies upon his possession as barring the complainant's suit under the statute of limitations.

The testimony in the record is voluminous, and we will advert only to so much of it as is material to the decision of the case.

It is apparent that efforts were made at the sale to induce persons not to bid; that they consequently did not bid, and that the property was sold considerably below its market value at the time. It was understood among the persons attending the sale and desiring to bid, that a compromise or settlement had been made between the parties; that Barrow was to become the purchaser, and that the sale was made in furtherance of that arrangement, and the bystanders, therefore, either declined bidding at all, or ceased to bid when informed of it. It does not clearly appear by whom this information was given, or who induced persons not to bid, but it is probable that all the parties, Gibson, Gray, Bryant, and Barrow, and especially the three first named, who were acquainted with the persons assembled, contributed to it. The highest valuation put upon the property is about $45,000, and it is shown that such property declined in market value from that time for several years, including the year 1842, when the complainant's note became due. Gray's deposition shows that he was about to institute legal proceedings to enjoin the sale, and would have done so but for the compromise with Barrow. Gibson's deposition shows that he pro-

posed the arrangement under which the property was sold; that he had then transferred the last note to Herring, but was anxious to promote the arrangement, as he was thereby discharged as indorser of the notes held by Barrow. He further states that afterwards, and in the year 1841, he sold property to the complainant in discharge of the note previously transferred by him to Herring and of other indebtedness, and took up that note thereby, the object being to reinvest Gibson, or his son who conducted the settlement for his benefit, with the full title to said note, and that Gibson retransferred the note to the complainant shortly before the commencement of this suit in May, 1848.

The first ground taken in behalf of the appellant is, that the sale was fraudulent in fact, to the injury of the appellant. It is insisted that the sale was made under the trust deed merely to carry out in form what had already been done in substance by private arrangement, a sale of the property; that biddings were prevented in order to bring the sale within the limit of the first note, the only one under which the trust sale could then take place, and give it the semblance of fairness and propriety, and that the property was thereby sacrificed and sold for the suspicious sum of exactly the amount of the first note. These circumstances, considered alone, would certainly show collusion and fraud in the transaction. But there are other circumstances indicating that there was no actually fraudulent and dishonest intent on the part of Barrow. He held a debt for upwards of $61,000, which he had no hope of realizing except by means of this deed in trust. The party bound by that deed was about to take steps to enjoin the sale which had been advertised, and to rescind the contract under which it was given, which, if successful, he would lose his whole debt, or if not successful, he would in all probability be greatly delayed and embarrassed in the collection of it. His debt amounted to greatly more than the property would sell for in the market. Believing, then, that his debt would ultimately absorb all the property, and in order to prevent the litigation about to take place in regard to it, he determined to give up his entire debt and to take the property for it; and in order to make the arrangement formal, and secure the property to himself, he chose that the sale should be made under the deed

Ragan *v.* Gray et al.

in trust. To this arrangement Gibson was a party, and there is nothing to show that Barrow had any notice at the time, but that he was the holder of the other note, as the deed in trust showed that it was payable to him. The arrangement, then, . might well have been carried out without any intention to prejudice that note, and even without any reference to it, and such is the distinct statement of Barrow in his 'answer. But it is asked, if no reference was had to the last note, why was not a simple deed taken from Gray, and if Gibson was the holder of the last note, why was not the deed in trust simply entered satisfied, as all parties in interest were content with the arrangement? It appears that Gray was insolvent, and there. might have been judgments against him which would have attached upon the property upon the satisfaction and discharge of the deed in trust, and a purchaser might well object to taking the title of a party so situated. Indeed, there could be no good objection, in point of rectitude of purpose, in Barrow's preferring that his title should be perfected through the deed in trust, when it could really work to the injury of no one, as his claims would, in all human probability, absorb the entire property, and were entitled to priority of payment, as he and the other parties to the transaction were fully aware.

2. It is objected that the sale was fraudulent in law or invalid, and should be set aside, 1st, because Bryant, the trustee, was a party to the agreement between Barrow and Gray, and interested in having it carried out, as he thereby would be discharged of his liability as indorser upon the notes held by Barrow; 2d, this sale, as claimed by the defendant Barrow, is justified on the ground that it was substantially a sale to secure the money on all the notes, whereas the trustee had no right to consider but the note then due, and no power to make the sale with reference to the notes not then due; 3d, that Bryant, after the execution of the deed in trust and notes, had become the holder of the notes and had transferred them by indorsement, and thereby became disqualified to act as trustee by reason of his interest in the matter. There is certainly much force in the first two points of objection. Unless there are circumstances of justification, it would be illegal for a trustee clothed with the power to sell

Ragan *v.* Gray et al.

property for a particular purpose, at public auction to the highest bidder, to participate in an arrangement by which a particular individual should become the purchaser, and carry out that arrangement by the form of a sale ostensibly public and to the highest bidder. Yet such a sale may be valid by the consent of the parties interested, which is frequently the case, or by the party attacking it not occupying a position which will enable him to do so successfully. And for the same reason, a sale made for a larger sum than the trustee is authorized by the deed to sell for, may become valid by the consent of the parties interested, or by the incapacity of the party complaining to object to it. The objection as to the disqualification of the trustee seems not to be insisted upon, and we therefore do not decide the point, as the view we take of all these objections would obviate that objection, and render the decision of it unnecessary.

Giving to the objections to the sale all the force for which the appellant's counsel contend, still it is insisted in behalf of the appellee that the appellant cannot avail himself of them, because it is shown that Gibson was a party to the arrangement as to the sale, and whether he was the holder of the last note at the date of the sale or not, he subsequently became the owner or beneficiary of it in 1841, whereby all the equity arising from his participation in the sale attached to it in his hands, and his subsequent transfer of it to the complainant in 1848, passed it subject to that equity. It is unquestionably true that the assignee of a note, under our law, takes it subject to all the equities existing against it in the hands of the assignor. But here a question is made as to whether Gibson became the owner of the note after it was taken up by settlement with Herring's administrator. And this point is clearly settled by the evidence. It is shown by Gibson's deposition, that at the time he transferred the note to Herring, he was indebted to him about $36,500, and that after his death, he had a settlement with his administrator, by which he conveyed to him land and negroes in discharge of his entire indebtedness to the estate, and " took up " this note, which he had indorsed to Herring, his object being to " reinvest himself with the full title to

'the note." It was a settlement of an indebtedness and liability on the part of Gibson to Herring's estate by giving property in discharge of it which was accepted by the administrator, and not a purchase of a note belonging to the estate by means of property sold to the administrator, as has been suggested. The property given in discharge of the indebtedness does not appear to have been conveyed or delivered back to Gibson, when the note was retransferred by him 'to the complainant; and although Gibson seems to have' come to the conclusion, after he had held the note from 1841 to 1848, that he was not legally entitled to hold it, yet the facts stated by him show that he had fairly settled it with the administrator, and taken it up, and his erroneous opinion of his legal right to the note cannot affect the right. The administrator had the power to settle the debt due his intestate, and, for ought that appears in this record, he exercised that right properly and for the benefit of the estate.

The equity in favor of the appellee against the note as against Gibson attached, therefore, when the note was retransferred to him, and followed it in the hands of the complainant, to whom he afterwards transferred it. This view of the case renders it unnecessary to consider the defences to the bill under the statute of limitations.

The decree is affirmed.

The counsel for appellant filed a petition for a reargument in this case, but the court refused to grant a reargument.