N. A. Isom, County Treasurer, vs. First National Bank et al..

1. Agency: *Interest on Chickasaw school fund.* Pro rata *to Lafayette county·*
   *on distribution.*
   Where M., county treasurer of Lafayette county, gave to L. an order to the
   auditor of public accounts for the amount due to said county, as interest due
   on Chickasaw school fund, and L. received the auditor's warrants on the state
   treasurer for the same, and deposited them in bank as collaterals to secure his·
   own indebtedness to the bank, *held*, that L. was acting as agent or attorney
   in fact for the county treasurer, and that the said funds belong to the county
   of Lafayette, and that the bank had notice of this fact.

2. Same: Same: *Auditor's warrants.*
   The law authorized the county treasurer to draw the interest on the Chickasaw·
   school fund from the state, by himself or attorney in fact, and where the.
   auditor of public accounts issues his warrants for the same to an attorney in
   fact, and the warrants bear upon their face evidences of their character, that
   they were issued "on account of interest on Chickasaw school fund," *held*,
   that this was full notice to the holders of the warrants of all that the words·
   quoted import, and the persons to whom they were transferred were thus.
   notified of the law, and its terms, under which the warrants were issued, upon
   a trust fund, held in trust for specific purposes, which could be disbursed only·

in the mode and for the purposes authorized by the law under which they were issued.

3. TRUSTEE: *Trust property.* Cestui que trust.
A purchaser for a valuable consideration with notice of the trust is held to be a trustee for the person beneficially interested. Whenever the trustee has been guilty of a breach of his trust, and has transferred the property, by sale or otherwise, to a third person, the *cestui que trust* has a full and perfect right to follow such property into the hands of such third person, unless he stands in the predicament of a *bona fide* purchaser for valuable consideration without notice. And if the trustee has invested the trust property or its proceeds in any other property, into which it can be distinctly traced, the *cestui que trust* has his election either to follow the same into the new investment or to hold the trustee personally liable for the breach of the trust. The words " trust " or "trustee" are held sufficient to put a party taking an assignment of a note containing those words on his inquiry as to the character of the note.

APPEAL from the Chancery Court of *Hinds* County.

Hon. E. W. CABANESS, Chancellor.

The material facts in this case are fully stated in the opinion of the court.

The dismissing the bill in the court below is assigned for error.

*W. L. Nugent*, for appellant:

This case might well be rested upon the former adjudications in this court upon the demurrer. The warrants, as their face show, were issued on account of interest due the county of Lafayette in the Chickasaw school fund, and the pleadings and proof show that they were taken by the appellees as collateral security for a preëxisting debt. In view of these facts the court said " it was difficult to conceive upon what grounds the demurrer was sustained" by the court below. 42 Miss., 99. But if the question at issue were open for discussion the same conclusion must be reached.

The warrants were issued to J. M. Lyles, on the 4th day of June, 1867, as the agent of the county treasurer, and there was no money in the treasury to discharge. Days after the issuance of the warrants, and when it was well known that they were " dishonored," so to speak, the negotiation was had between Lyles and the appellees. They therefore stand in no better

position than Lyles. It is too firmly established to admit of controversy that no man can acquire a chattel personal from one who has no title to it; and whether it is true that bank notes, money, and *commercial paper assigned before maturity to an innocent holder* constitute exceptions to the rule, it is rigidly applied in all other cases. Thus, in Andrews *v.* Pond, 13 Pet., 79, the Supreme Court of the United States said that a person who takes a bill which, upon the face of it, was dishonored, cannot be allowed to claim the privileges which belong to a *bona fide* holder without notice. So the purchaser for value of a promissory note, *after maturity*, cannot assert title, because of his purchase, against the real owner. Thomas *v.* Bell, 8 Ga., 421. In Donn *v.* Halling, 10 Eng. C. L., 347, the same question was decided, Butler, J., saying : " If a bill, or note, or check be taken after it is due, the party taking can have no better title than the party from whom he bought." Holroyd, J. : "The party takes it at his peril." Abbott, C. J. : " The plaintiff having shown the property in the check once to have been in him, it was incumbent on the defendant, who had taken it after it was due, to show the party from whom he took it had a good title." See, also, the cases of Clark *v.* Sigourney, 17 Conn., 511 ; Emanuel *v.* White, 34 Miss., 56 ; Fisher *v.* Leland, 4 Cush., 456.

The defense of a *bona fide* purchaser has not been established. The title of appellant's predecessor in office, and the special agency of Lyles, are fully proved, and the additional fact that the warrants had been at first indorsed in blank, and left with appellees on account of the county treasurer. At least it is shown that such report was made by Lyles, and there is nothing in the record to show it was not true. The arrangement with the appellees was made afterwards by Avant, the partner of Lyles in banking, at Oxford. The *onus* was thus cast upon appellees, and they offered no evidence at all—not even their own deposition. They could not, however, well dispute their letter of July 29, 1867, to Lyles' administrator, which shows

that the warrants were merely held as collaterals to a *pre-existing debt* against Avant & Lyles, held by appellees for collection.

The appellees are chargeable with notice. There were facts and circumstances calculated to excite attention or put any ordinary man upon inquiry, and they were notice of everything to which such attention or inquiry ought reasonably to lead. Parker *v.* Foz, 53 Miss., 260.

The appellees knew they were dealing with Avant & Lyles, neither of whom could have acted in the premises except under delegated authority, and it is their own folly if they did not inform themselves of the scope of the authority. The principal was bound only in so far as he had consented to be bound, and was no further concluded than as the agent had pursued his power. Dozier *v.* Freeman, 47 Miss., 660. What are these facts? They may be briefly recapitulated thus: 1. The warrants were only payable to the county treasurer or his agent, and the appellees were bound to know that Lyles was acting under delegated authority. 2. The warrants were indorsed in blank by Lyles alone, and not by the firm of Avant & Lyles. 3. The firm of Avant & Lyles was then bankrupt and insolvent. 4. The order of the county treasurer to the auditor was to pay the money to the bearer, J. M. Lyles, and the warrants were issued to him upon that order. It was not an assignment of the account, but a simple authority given to collect the money. Then his agency terminated. 5. The warrants show that the money was part of the Chickasaw school fund, and the amount was large. 6. The order was not given to *Avant & Lyles*, for whose debts they were pledged as collateral, but to J. M. Lyles as an individual. 14 Allen, 523; 100 Mass., 382; 3 M. & S., 574; 11 Jur. (N. S.), 98; Am. Law Rev. for April, 1872, p. 552.

*Shelton & Shelton*, for appellees.

[Reporters find no brief on file for appellees.]

Tarbell, J., delivered the opinion of the court.

Bill to enjoin the First National Bank of Jackson from

receiving, and the state treasurer from paying, certain auditor's. warrants, and to deliver the sum of their proceeds to complainant. There was a demurrer to the bill, on which the case, was taken to the high court of errors and appeals, and adjudged as reported in 42 Miss., 99. The cause being remanded,. answers were filed, when the injunction which had been granted was dissolved, and the bill dismissed. Hence the case is in this court on its merits, on bill, amended bill, answers, exhibits, and proof. The error relied on is that the court ought to have rendered a final decree for the complainant, and not, for respondents.

The facts are these: By act of the legislature, approved February 19, 1867 (Laws, p. 391), the auditor was directed to apportion or distribute the interest due the counties entitled on the Chickasaw school fund. By this act it was declared that "the act approved 7th March, 1856, entitled an act to provide for the payment of interest on the Chickasaw school fund, and for other purposes, shall be strictly observed in all respects, and declared hereby to be in full force and effect." The auditor was required to make distribution, and issue his warrants on the treasurer of the state, May 1, 1867. Accordingly the auditor notified the county treasurer of Lafayette county that there was due that county the sum of $13,259.69. The notice from the auditor is made an exhibit to the bill. The treasurer of Lafayette procured from the probate clerk of the county the certificate, required by the act of 1856, to entitle him to draw the money. A copy of that certificate is filed as an exhibit to the bill. It is averred that the treasurer of Lafayette county authorized J. M. Lyles, a resident of, and banker in, said county, to receive said money from the state, as. the agent of the county treasurer, and to bring it in person to. him for the use of the county. A copy of the order empowering J. M. Lyles to draw said money is made an exhibit to. the bill, and is in these words: "Pay the within amount,. thirteen thousand two hundred and fifty-nine dollars and sixty cents, to the bearer, J. M. Lyles. (Signed) A. McLeod, county treasurer." In pursuance of this authority the war-

rants in controversy were drawn and made payable to the order of J. M. Lyles, June 4, 1867, and by him receipted for in his own name on the same day, a copy of which receipt is made an exhibit to the bill. It is further averred that, upon the return of Lyles to the county of Lafayette, he informed the county treasurer that he had drawn the warrants for the money from the auditor, but that there was no money in the treasury, so that they were not paid, and were deposited in the First National Bank of Jackson, for collection, and that they could be collected and paid whenever there was money in the treasury to pay them. J. M. Lyles died suddenly in July, 1867, and W. L. Lyles was, on the 24th of that month, appointed to administer upon the estate of the deceased. W. L. Lyles visited Jackson to see about these warrants, and reported to the county treasurer that they had not been left for collection merely, but had been deposited as collateral security for a personal debt of the said J. M. Lyles.

It is further averred that Lyles deposited the warrants in the First National Bank of Jackson, as collaterals, under an agreement that, on paying the claims to which they were collateral, the warrants should be returned to the said Lyles; that such action of Lyles was wholly unauthorized, and without any power or authority, and was a breach of the trust reposed in him by the county treasurer; that his acts were illegal, and gave to the bank no right to hold said warrants, or to collect the same; that the warrants showed on their face that they were trust funds, and were issued on account of interest due on the Chickasaw school fund; that the said bank is not the *bona fide* holder of said warrants; that the said bank holds said warrants subject to the order of the treasurer of said county of Lafayette; that said J. M. Lyles informed complainant that the warrants were deposited with said bank, subject to the order of said county treasurer, and, if so directed by the board of police, he would bring said warrants and place them in the possession of said complainant, with a prayer for injunction and relief.

On the 18th of October, 1857, an amended and supplemental bill was filed, wherein it is averred that the original bill was marked filed by the clerk, August 1, 1867, whereas in fact it was filed July 31, 1867, and should have been so marked by him ; that the bill, with the order for the injunction, was taken by the solicitor for the complainant, on the evening of July 31st, to the clerk's office, and requested that the same be filed and injunction issue on the same evening, but that said clerk was playing a game of chess, and declined, saying that he would issue the process in the morning ; that the solicitor urged his request for process on that evening, but the clerk persisted in declining to issue process until the next morning ; that the next morning the solicitor met the clerk on the street, at about nine o'clock, when the solicitor informed the clerk that he was in pursuit of process, etc. ; that the clerk told him to go on to the office, and he, the clerk, would be there in a few minutes ; that the solicitor proceeded to the clerk's office, where he waited the return of the clerk for the period of an hour ; that the clerk erased the date of filing placed on the papers the evening previous, striking out July 31st, and inserting August 1, 1867, as the date of filing ; that the clerk then said to the solicitor that he felt it to be his duty to tell him that Mr. Joshua Green, before said bill was filed, had told said clerk he had been informed that the county treasurer aforesaid intended to enjoin the payments of said warrants, and he wished the clerk to inform him of the filing of the bill as soon as it was done, and, accordingly, he (the clerk) had given Mr. Green the desired information ; that such information was given on the evening of July 31, or morning of August 1, 1867, before the clerk would issue the injunction ; that on July 25, 1867, complainant and Joshua Green had an interview, at which the respective rights of the parties to the warrants were fully asserted ; that said Green read to the complainant a written memorandum, whereby it appeared that the bank held said warrants as collateral security for the payment of certain notes, one of which was the note of John H. Echols, state

treasurer, and that when said notes were paid, the warrants were to be returned to the said Lyles; that complainant then. went to John H. Echols, state treasurer, and fully informed. him of the rights of complainant to the warrants and their· proceeds; that the state treasurer informed said Green of complainant's purpose to sue out an injunction, etc.; that said. warrants were transferred by said Green after notice of com-· plainant's rights; that some of them were paid to the state· treasurer on August 1, 1867, though entered by him in the treasurer's books as having been received by him July 31,. 1867, but that the state treasurer says they were received by him prior to the service of injunction, which was served on him August 1, 1867; and there is a prayer for injunction, and for a decree declaring Green to be trustee, etc., for complainant, as county treasurer, etc.

The answer of the First National Bank avers that by the order of complainant to Lyles, for the warrants, he violated his fiduciary duty, and assumed the risk of all the conse-· quences; denies that complainant authorized or empowered J. M. Lyles to receive said funds as the agent of complainant, and bring them to him for the use of Lafayette county; on the contrary, the order was absolute on its face, and not in any fiduciary character. Avers, without personal knowledge on the part of respondents, that the equivalent of such absolute arrangement was made between the complainant and Lyles. Respondents believe and charge that some arrangement was made, on which the complainant took the responsibility to· assign the fund here, not to Lyles as agent, but in a form which gave him absolute title and control of the fund. Avers. that Lyles, after procuring the warrants, presented them to the treasurer for payment, and they would have been paid if the money had been in the treasury to pay them. Avers that the warrants were not *deposited* in the bank by Lyles, but were indorsed by him in blank, and paid into the bank by Avant, for Avant & Lyles, absolutely, and for a valuable consideration. Respondents had no notice, at the time, of any claim by com-

plainant. Respondents state that Avant & Lyles owed J. R. Kennard a note for $1,500, due 14th May, 1867; to J. H. Echols two notes of $2,500 each, one due 13th May, 1867, the other 13th August, 1867, and to Z. A. Phillips an account for over $3,000, which notes and account were in the possession of the First National Bank, at Jackson, and said bank had advanced to the several creditors, on the faith of said notes and account, large sums of money, and was authorized to receive payment of the notes and account, either in full or in part, and, previous to the transfer of said warrants, had been urging upon Avant & Lyles payment of the notes and account, then past due. On June 4, 1867, Avant produced said warrants, payable to and indorsed by Lyles—a copy of one of which is filed as an exhibit to the answer—and proposed, under a prior agreement, to discharge the notes by a transfer of the warrants, the balance to be credited on the account, which offer was accepted, when Avant voluntarily promised that if the warrants were not paid by the treasurer, or if they were not very soon available to respondents, Avant & Lyles would, when notified, take them back and pay the money. As a part of this arrangement the bank loaned Avant & Lyles $2,000 in cash. Upon the faith of these warrants, as the property of Kennard, Echols, and Phillips, then under the control of respondents, the bank, after reception of said warrants, made large advances to Kennard, Echols, and Phillips. These were made upon the faith of the warrants. Most of the warrants were taken out by Kennard prior to July 25, and all of them prior to August 1, 1867. Answer denies that the warrants showed on their face any trust whatever. They were issued on account of interest of Chickasaw school fund department, and were part of the circulating medium of the country. They were received in the regular course of trade, without notice of adverse claim, until July 25, 1867. The bank held the warrants as substitutes for the discharged notes of Avant & Lyles, and as security for the debts owed to it by Kennard, Echols, and Phillips.

Respondents admit service of the injunction, at ten A. M., August 1, 1867, and that on that morning the clerk, at their prior request, informed J. Green of the institution of this suit. Avers that the county is amply secured by the treasurer's bond, to which it ought to look for these funds, and not to respondent's (Green).

An answer is also filed by J. H. Echols, the state treasurer, and one of the defendants herein, who adopts the answer of the Greens, and adds some material facts. He shows that the warrants in question were received by him into the treasury on July 29 and 31, 1867—all subsequent to July 25; that he was personally and pecuniarily interested in the transactions involved; that in his action he was advised by the then attorney general of the state, who concurred in the course he pursued.

The deposition of Ward G. Vaughan was taken, who testified that he heard a conversation between John M. Lyles and Angus McLeod, treasurer of Lafayette county, with reference to the warrants involved, which conversation occurred at the office of the circuit clerk, in Oxford. Lyles said he could not get the money on the warrants; that he had them issued in the name of Angus McLeod, and deposited them with Messrs. Green, subject to his order. This conversation was on July 1, 1867. Lyles had just returned from Jackson. Witness was circuit clerk; McLeod was county treasurer, and was in the office with witness. Witness knew that McLeod had sent for the warrants by Lyles.

There was also filed in evidence a letter from the Greens to W. L. Lyles, under date of July 29, 1867, as follows: "Dear Sir: We were called on a few days since by the county treasurer, accompanied by an attorney, who inquired about the state warrants issued on account Chickasaw school fund. Since, we learn that he is getting out an injunction to prevent the treasurer from receiving said warrants. This can only be done on the grounds that Mr. J. M. Lyles committed a fraud in the use of the warrants—an imputation, we are sure, you

will not willingly suffer imputed to him. In case they are stopped, we shall ask and expect that they be redeemed and taken out of our hands at the earliest possible moment, as we don't desire to have to defend the case when there is the charge of fraud. We submit the matter for your consideration, and ask a reply at your earliest convenience. (Signed) Respectfully yours, J. & T. Green."

The provisions of the act of 1856 (ch. 56, p. 146) are these : Section 1 made it the duty of the auditor annually to credit Chickasaw school funds account, required to be opened between state and the fund by the 5th section of the act of February 23, 1848 (Hutch., p. 234), with interest, etc., which said interest shall be drawn from the treasury in the manner hereinafter provided.

By § 2, county treasurers were entitled to a distributive share of such interest, upon complying with the conditions hereinafter set forth.

Section 3 made it the duty of the secretary of state to apportion to the counties entitled their proportionate amount of said interest, and it made it the duty of the auditor to issue his warrant on the state treasurer for said proportionate amount, upon application to him by said county treasurer in person, or by attorney in fact, accompanied with satisfactory proof that said county treasurer has fully complied with the requirements of this act; and it shall be lawful for any sheriff in this state to cash the orders of the county treasurer of his county, for the amount of the interest due his county; and the auditor of public accounts is hereby authorized to receive said order from such sheriff, in his settlement of state taxes.

Section 4 required county treasurers to give bonds for the faithful performance of the duties required by law in relation to said moneys.

Section 5 provides for a successor to the county treasurer in the custody of this fund.

Section 6 prescribes a penalty for a failure of duty on the part of the county treasurer.

Section 7 empowers boards of police to fix the compensation of county treasurers for the services herein required.

Section 8 requires the treasurer to keep a book and an entry of everything pertaining to this fund.

Section 9 authorizes boards of police to appoint school commissioners in certain cases.

Section 10 is as follows : " That the interest moneys in each county shall be held subject to the order of the board of school commissioners of such county, which is hereby authorized to expend the same in accordance to the existing laws, or laws that may hereafter be passed applicable to the respective counties of the Chickasaw purchase, in relation to common schools."

The remaining sections of said act have reference to the loan of the Chickasaw school funds to the railroads.

Section 5 of the act approved February 23, 1848, reads as follows : " That it shall be the duty of the auditor of public accounts to open an account between the state of Mississippi and the fund realized from the lease of said lands, in a book to be kept by him for that purpose, in which he shall charge the state with the several amounts received on account of said lands, the whole amount of which, after deducting the expenses of said sales, as well as expenses incurred by the state for locating said lands, shall be a charge upon the state of Mississippi, to be held in trust by said state for the use of schools in the Chickasaw cession, and to be applied to that purpose, as hereinafter provided by law."

Treating auditor's warrants as commercial paper, the facts of this case, by which it must be solved according to appropriate rules, are these :

1. Auditor's warrants are like bank checks in this, that they cannot be entitled to days of grace. In the case at bar they were, on being issued, presented to the treasurer for payment, but there was no money in the treasury and they were then, with the full knowledge of the Greens that they had been dishonored, transferred to the First National Bank, the Greens and

58

the bank being identical. Reference is made to the answer of the Greens, which states the warrants to have been presented to the treasurer, and the money demanded, before their transfer to the bank, and that they would have been paid but for the fact that there was no money wherewith to pay them. Record, p. 63.

2. The warrants bore on their face evidence of their character, viz., that they were issued " on account of interest on Chickasaw school fund department." This was full notice to the holders of the warrants of all the words quoted import. The Greens were thus notified of the law, and its terms, under which these warrants were issued upon a trust fund, held in trust for specific purposes, who could disburse the money only in the mode and for the purposes authorized by law.

3. The Greens were also thus informed, or would have been on inquiry, that Lyles was not the owner· of these warrants, but the mere agent, or " attorney in fact," under the law cited, for obtaining them, and of conveying them, or the money, to the proper officials of Lafayette county.

The record negatives the theory of respondents, of a prior arrangement between the county treasurer and the firm of Avant & Lyles, bankers, for the sale of these warrants in advance of their issuance. Such a disposition of the warrants would have been a violation of the terms of the law under which they were drawn. But the record does not sustain this theory. Lyles, and not Avant & Lyles, was authorized as " attorney in fact," within the letter of the law, to draw those warrants. Any disposition or transfer of them, other than their delivery to the county treasurer, was unauthorized and illegal—of all which, in fact or in law, the Greens had notice.

4. No testimony was taken in support of the answer. In rebuttal of its averments and theories a letter from J. & T. Green to W. L. Lyles, under date of July 29, 1867, copied in full herein, was filed as evidence and made part of the record. This letter shows that these warrants were received and held

as collaterals. It appears from the record that they were all received into the state treasury on the 29th and 31st days of July, 1867, after all the parties interested were in full possession of the facts. The letter of the Greens shows that these warrants were held by them on the 29th July merely as collaterals, and subject to redemption, and their redemption was, by the letter, requested.

5. Although the public believed Avant & Lyles to be men of integrity and pecuniary ability, the respondents, pecuniarily concerned, and probably they only, knew personally that they were financially embarrassed; that their paper and account herein described were overdue; that the Greens had pressed for payment, and that they were relieved from their embarrassment only by the warrants involved.

Referring to the adjudication of this case on demurrer, it will be seen that, with the exception of a single point, the law governing it is substantially, if not definitely, settled. The excepted point is thus stated. It must, however, be conceded that it is certainly for the benefit of the commercial world to give as wide an extent as practicable to the credit and circulation of negotiable paper. But whether it should pass in payment of, or as security for, preëxisting debts so as to preclude prior questions, is very questionable, and about which there is considerable diversity of judicial opinion. With reference to this point the court remarked that it was at that time unnecessary to determine it, and the same is believed to be equally true on this occasion, in view of the controlling facts as above stated. The case is not materially changed and this point is not involved. Our predecessors, in deciding this case on demurrer, said: "It is the well established doctrine of equity that purchasers for valuable consideration with notice of the trust are in each case held to be trustees for the persons beneficially interested. It is a clearly established principle of equity jurisprudence that, whenever the trustee has been guilty of a breach of trust, and has transferred the property, by sale or otherwise, to any third

person, the *cestui que trust* has a full and perfect right to follow such property into the hands of such third person, unless he stands in the predicament of a *bona fide* purchaser for valuable consideration without notice.   And if the trustee has invested the trust property, or its proceeds, in any other property into which it can be distinctly traced, the *cestui que trust* has his election either to follow the same into the new investment or to hold the trustee personally liable for the breach of the trust." 1 Story's Eq., 514, §§ 533, 534 (9th ed.); Oliver *v.* Piatt, 3 How. (U. S.), 401; 4 Kent's Com., 307 (11th ed.).

It was further said that "Lyles was, in equity, a trustee, and in passing off the warrants was guilty of a breach of trust; yet, if the bank—or the Greens—took them *bona fide* and for valuable consideration, without notice of the trust, they held them divested of the trust; but if they received them with notice of the trust, or without consideration, they took them clothed with a trust." The case thus becomes simple in its solution. In principle, Prosser *v.* Leatherman, 4 How., 237, is like the present. There the suit was upon a note which on its face bore evidence that it was the property of an estate, the administrator of which had transferred it in violation of his trust. The court say: "The authorities all agree that an improper transfer, with the knowledge of the purchaser, imposes on him a liability in equity in favor of those interested. * * * The executor having the rightful possession of the assets, a knowledge on the part of the purchaser of the illegal disposition would of course be necessary." Lord Kenyon is quoted as saying: "If, upon the face of the assignment of property, it appeared," etc. Lord Thurlow is quoted as saying that "if a party concert with the executor to obtain the effects of the estate, in any manner contrary to the duty of the office of executor, the purchaser or pawner will be liable." And Chancellor Kent is thus quoted: "That the purchaser is safe, if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds,

or was in fact, by the very transaction, applying them to the extinguishment of his own private debt. The great difficulty has been to determine how far the purchaser dealt at his peril, when he knew from the very face of the proceedings that the executor was applying the assets to his own private purposes, as the payment of his debts. The latter and better doctrine is that in such cases he does buy at his peril, but if he has no such proof or knowledge he is not bound to inquire into the state of the trust, because he has no means to support the inquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust." See Field v. Scheiffelin, 7 Johns. Ch. 150. The court, in Colt v. Leonier, 9 Cow., 320, declare the correct rule, both in England and New York, to be (p. 342) "that any person receiving from an executor the assets of his testator, knowing that the disposition is a violation of his duty, is to be adjudged as conniving with the executor, and that such person is responsible for the property thus received, either as a purchaser or a pledgee." This rule is approved in Prosser v. Leatherman, *supra*.

Lord Ellenborough, in Taylor v. Plummer, 3 M. & S., 562, says "that an abuse of trust can confer no right on the party abusing it, nor on those who claim in privity with him." In Sturtevant v. Jaques, 14 Allen, 523, and Shaw v. Spencer, 100 Mass., 382, the words "trust" and "trustee" were held sufficient to put a party, taking an assignment of a note containing those words, on inquiry. The notes were in form discharged, but remained in the bank, in Farrington v. Frankport, 24 Barb., 554, as in the case at bar. The bank in that case was held not a *bona fide* holder. In Bay v. Coddingtons, 5 Johns. Ch., 54, 20 Johns., 637, the party transferring notes to the Coddingtons as collaterals, as in the case at bar, was indebted to the firm on notes past due. It was held that the notes were not negotiated to them in the usual course of business and trade, nor were they the holders of the notes for a valuable consideration, within the meaning or policy of the law. The notes were received. The notes were received after

the party transferring them had stopped payment and become insolvent, within the knowledge of the Coddingtons. Hence, say the court, "there is no case that entitles such a holder to the paper in opposition to the title of the true owner." And the court also said—what would seem to be pertinent in the case at bar—that the notes "were seized upon by the Coddingtons, *a tabula in naufragio*, to secure themselves against contingent engagements previously made for R. & S., and on which they had not then become chargeable." 1 Parsons on Notes and Bills, § 4, p. 218, *et seq.*, and authorities cited in notes.

It is stated in Story on Prom. Notes, § 190, that the general rule as to defenses between the original parties applies to all cases where the party takes the note, even for value, after it has been dishonored or is overdue; for then he takes it subject to all the equities which properly attach thereto between the antecedent parties. See the cases cited in notes to ib., §§ 195, 196, 197. And see Byles on Bills, ch. 11, Of Transfer, etc.; Sylvester *v.* Crapo, 15 Pick., 92; Thompson *v.* Hale, 6 ib., 259; Ayer *v.* Hutchins, 4 Mass., 370; Nitsom *v.* Holmes, 5 ib., 543; Rice *v.* Goddard, 14 Pick., 293; Burnett *v.* Offeman, 7 Watts, 130. Also cases cited in note 1, p. 240, Byles on Bills, 5th Am. ed.

"After a bill or note is due," says Lord Ellenborough, "it comes disgraced to the indorsee, and it is his duty to make inquiries concerning it." Byles on Bills, 284. An indorsee of a bill dishonored or after due, with notice, has not all the equity of an indorsee for value in the ordinary course of negotiation. Ib., 283. This author divides the subsequent holders of negotiable instruments, vitiated for the cause stated, into two classes: transferees without value, and transferees with notice. Ib., 224. And this notice may be explicit, as when the holder has notice of all the particular facts avoiding the bill; or it may be only general, as when the holder has only notice of *some* ground of vitiating it, which will equally destroy his title. Ib., 225, 226; Byles on Bills, 10, Of the Consideration.

The warrants of the auditor are in this form of bank checks, and without days of grace. Story on Prom. Notes, ch. 11, § 487, *et seq.; * The Mayor *v.* Ray, 19 Wall., 468.

A *bona fide* holder of negotiable paper is thus defined : One who, for full value, obtains from the apparent owner a transfer of negotiable paper before it matures, and who has no notice of any equities between the original parties, or of any defect in the title of the presumptive owner, is to be deemed *bona fide* holder. Story on Notes, § 197, note 3, and cases there cited.

In Ragan *v.* Gray, 27 Miss., 645, the doctrine is very broadly stated that "it is unquestionably true that the assignee of a note, under our law, takes it subject to all the equities existing against it in the hands of the assignor." See Code, 1857, art. 2, p. 355. If possible, stronger language is used in Barringer *v.* Nesbit, 1 S. & M., 22, wherein it is said : "An assignee takes the place of the assignor, and if the latter has been guilty of fraud in the transaction, the former is equally affected by it."

The word "agent" being attached to the drawer's name, and the bill to be charged to the drawer's own agency, was held, in Davis & Gaines *v.* Henderson, 25 Miss., 549, sufficient to put a prudent man, taking the bill from the drawer, on inquiry as to the precise terms of the contract between the original parties ; and the court say : "It will be sufficient if enough appears upon the face of the transaction to put a prudent man, upon taking the bill, upon inquiry." Watt *v.* Hicks, 1 Cow., 513. When it can be done consistently with justice and sound policy, an indorsee ought, in all cases, to be confined to the contract as made and assented to by the immediate parties. This rule is only relaxed in favor of innocent holders who, from the language employed by the original parties, have good reason to believe that the contract was subject to no condition or restriction as to the liabilities of the parties appearing to be bound thereby. But the reason of the rule ceases the moment it appears that the indorsee could not,

with ordinary prudence, have been misled in regard to the terms of the contract.

As understood, the facts in this case, and the rules of law applicable thereto, conduct to a very clear conclusion adverse to the claims of the First National Bank, and this result is inevitable upon the opinion entertained of the facts, that the bank took the warrants with full knowledge. Goodman v. Simonds, 20 How., 343 ; Parker v. Foy, 43 Miss., 260 ; Dozin v. Freeman, 47 ib., 647 ; Andrew v. Pond, 13 Pet., 29 ; Thomas v. Bell, 8 Ga., 421 ; Done v. Hathing, 10 Eng. C. L., 349 ; Clark v. Sigourney, 17 Conn., 511 ; Emanuel & Barrett v. White, 34 Miss., 56 ; Holmes v. Carman, ——, 408 ; Briscoe v. Thompson, ib. 155 ; Shepherd v. McEvers, 4 Johns. Ch., 135 ; Carpenter v. Bowen, 42 Miss., 28 ; The Mayor v. Ray, 19 Wall., 468 ; 2 Story's Eq. Jur., §§ 1255, 1257, 1258, 1260, 1261 ; c, 1261 ; d, 1262, and the authorities referred to in the cases herein cited. Under the circumstances Lyles had no title, and conveyed none. With reference to the commercial character to be given to state, county, and city warrants, scrip, and checks, a very thorough discussion is contained in the Mayor v. Ray, *supra.* In the view adopted of the case at bar, however, this subject is not material, as full knowledge on the part of respondents is held to underlie and control alike the rights of the parties and the result. The doctrine of that case is that defenses to these warrants are not as restricted and limited as in case of commercial paper. Two points urged by counsel should not be passed unnoticed. One relates to the limitation of defenses between parties to commercial paper based on its dishonor. The rule as to the receipt of overdue or dishonored paper is invoked only to the extent of putting the party upon inquiry. The defense admissible in the case at bar, if this were the only source of information to the bank, is not intended to be discussed. The other is the claim of material advantages to the bank by the *laches* of the county treasurer. This argument has been more carefully considered than any other, or certainly not less studied

than its seriousness demands.   But the cases cited in its support do not sustain the proposition asked to be declared, nor has any authority been found upon which, in view of the facts, to base an equity in favor of the respondents because of the *laches* of the original complainant.   The key to the opinion and to the result reached is in the fact that the warrants were received by the bank with full knowledge, and thereupon the respondents were not *bona fide* holders.   This is the conclusive answer to the able arguments of counsel, all of which have been fully considered.   The chancellor erred.   There should have been a decree granting the relief prayed for in the bill.

The decree therefore will be reversed, and this court, proceeding to render such decree as the court below ought to have rendered, doth order, adjudge, and decree that complainant recover of respondents the amount equal to 90 cents on the dollar for the whole amount of the warrants in controversy, that being the value of the warrants conceded in the answer, together with 6 per cent. interest annually, besides costs, etc.   The clerk of this court will compute the sums due and enter a decree accordingly.[1]

[1] NOTE.—Application for reargument was made, and refused by the court.