## THE MAYOR *v.* RAY.

A city corporation, the charter of which gave to it the usual powers formerly given to such corporations, but which did not give to it the power to borrow money, being, and, for some time having been, pecuniarily embarrassed, issued its checks, in form negotiable, and drawn by the mayor and recorder of the city on the city treasurer. The checks were presented to the city treasurer and by him indorsed with his name and the date of his indorsement; it being the practice of that officer, in the then embarrassments of the city, thus to indorse checks when the city was not in funds to pay them, in order that the checks might thereafter draw interest; as it was understood that they would do. The checks were then taken by the holder, and, according to a then prevalent custom to pay them for taxes, were paid to the treasurer of the board of education of the city in discharge of school taxes. This officer (again, according to a then prevalent custom) sold them to A. (selling them for eighty cents on the dollar), and with the money discharged the salaries due by the city to the teachers of its public schools.

On suit by A. against the city, the court below excluded evidence tending to show fraud and want of consideration, and authority to make them, in the issue of the notes; and held that under its charter the city could issue promissory notes, and that if signed by the proper officers and given for a good consideration, they would be legal and obligatory; that a usage to reissue such securities was good, and that though upon their face overdue they were payable on demand, and not to be deemed dishonored

so as to let in defences against a subsequent holder, until the lapse of a reasonable time for making demand; that the reissue, if made with the sanction of the city authorities, would be valid, and that such sanction might be presumed from circumstances. It gave judgment accordingly.

On the case coming here, the judgment was reversed; five judges only out of eight, of which the court was then composed, concurring in the judgment of reversal.

Four of these judges placed the judgment on the broad grounds:

1. That municipal corporations have not the power, without legislative authority expressly or clearly implied, to borrow money, or to issue notes, bills, or other securities of a commercial character, free from equitable defences in the hands of *bona fide* holders.

2. That such corporations are of a public character, instituted for purposes of local government, and constitute part of the domestic government of the state; that the power of taxation is given to them for the purpose of raising the means of carrying on their functions, and that the creation of such special power is exclusive of others.

3. That the officers of such a corporation cannot, like the officers of a private corporation, create, by their acts, an estoppel against the corporation, its taxpayers, or people, so as to render illegal issues of ordinary city drafts or vouchers (not authorized by law) valid in the hands of holders for value; that such holders are affected with notice of the illegality.

4. That certificates of debt, city warrants, orders, checks, drafts, and the like, used for giving to the public creditors evidence of the amount of their claims against the city treasury, are valid instruments for that purpose, and may be transferred from hand to hand; but that they are not commercial paper, in the sense of creating an absolute obligation to pay them, free from legal and equitable defences; and that the holder takes them subject to such defences.

These judges admitted, however, and as of course, that when power to borrow money and to issue bonds or other securities of a commercial character therefor is given to a municipal corporation, such securities will possess the usual qualities attaching to like securities issued by private corporations.

The remaining one of the five justices—not agreeing to all thus declared, and holding that the city, unless clearly forbidden by its charter, could issue negotiable notes to pay its debts, and that such notes would be subject to the law governing negotiable paper, and holding especially that the corporation, having received and still holding the money for the notes, could not repudiate its contract to pay—put his concurrence in the reversal on the narrower grounds:

1. That the judge erred in charging that though the checks had been presented for payment, and payment had been refused; and though the time of such presentation and refusal had been noted on them, the checks were not to be deemed dishonored so as to let in defences between the corporation and a subsequent holder.

2. That the plaintiff being thus not a holder *bona fide*, the court erred in ex-cluding the offers to show fraud, corruption, or want of authority in the issue, of the checks.

3. That it erred in charging that if it was the usage of the corporation to reissue its securities by sale in the market, after such securities had been fully paid and satisfied, such reissued securities were obligatory upon the corporation.

ERROR to the Circuit Court for the Middle District of Ten-nessee; the case being thus:

Ray sued the mayor and city council of Nashville to re-cover the amount of nineteen corporation drafts, or orders, ranging from a few dollars in amount to over $1000, and together amounting, with interest, to over $9000. In form, they were drawn by the mayor and recorder upon the city treasurer, payable to some person named, or bearer, and were impressed with the city seal. The following is one of the orders, and shows the form of them all.

---

No. 3521.                                                          $1000.

NASHVILLE, December 23, 1868.

𝕿𝖗𝖊𝖆𝖘𝖚𝖗𝖊𝖗 of the 𝕮𝖔𝖗𝖕𝖔𝖗𝖆𝖙𝖎𝖔𝖓 of 𝕹𝖆𝖘𝖍𝖛𝖎𝖑𝖑𝖊.

*Pay to A. J. Duncan, or bearer, one thousand dollars, on account of water-work.*

A. E. ALDEN,                              W. MILLS,
        Mayor.                                          Recorder.

[Indorsed:] THOS. G. MAGRANE, Treasurer, December 26, 1868.

---

This was the form in which all city dues were usually paid. The indorsement by the treasurer was made when the orders were presented to him. Evidence was given by the plaintiff tending to show that it had been the custom for many years, when the treasurer failed to pay such checks on presentation, for him to write his name on the back, with the date of presentation, and afterwards, in the payment of such checks, to allow interest from that date, and that it was usual to present such checks for indorsement to draw interest when it was known there were no funds for their payment; also, that it was the well-known custom of the

proper collecting officers of the corporation to receive such checks for taxes and other dues of the corporation; that at the time these checks were issued, and at the time they were bought by the plaintiff, the city was largely involved in debt, and that many such checks were outstanding unpaid, and were bought and sold in the market, and that nearly all the city taxes were paid therewith; that for some time before the plaintiff purchased the checks in question the taxes for the support of public schools were collected and paid over to the treasurer of the board of education in such checks; and for about five months before, it had been the practice of such treasurer to sell such checks and to use the proceeds in payment of teachers; also, that all the checks sued on (except one for $1000, payable to Julius Sax), were so received for. taxes, and paid to the said treasurer of the board of education, and by him sold soon after receiving them to one McCrory as agent of the plaintiff to buy the same, at the rate of eighty cents on the dollar, *and the proceeds paid to teachers;* that the check payable to Sax was purchased from him by McCrory, as the plaintiff's agent, for $800, being one of sixteen checks of $1000 each, issued by order of the chairman of the finance committee of the city council without any order of the council, and hypothecated with Sax as security for a loan of $12,000, payable in four months (half of which was made in city checks), power being given in the loan note to sell the hypothecated checks, if the loan was not paid when due. Sax sold the check in question to the plaintiff within a week after receiving it. The plaintiff also offered the evidence of the city recorder to show that the checks sued on were made in the usual course of business of the corporation and for corporation purposes; also, evidence tending to show that the city collector, in collecting checks for taxes, was in the habit, in making change, of paying out checks previously collected, and that the mayor and council were informed of the practice pursued by the collector of reissuing checks which he had received in payment of taxes by paying a portion of them over to the board of education, and knew of the prac-

tice of issuing and hypothecating checks for loans and selling them for money.

The defendant introduced proof tending to show that McCrory, the agent of the plaintiff, when he purchased the eighteen checks, had notice that they had been received by the tax collector and reissued by him to the treasurer of the board of education (the evidence showing that the presentation and neglect to pay had in most instances been made nearly two months before, and in one instance nearly four months); also, that the city council had no knowledge of the manner of making checks on the mere order of the chairman of the finance committee, and their hypothecation and sale for money; and that some of them had no knowledge of the reissue of checks by the collector.

The charter and ordinances of the city were put in evidence, and were referred to on the argument before this court.

The former was couched in the usual form of such charters, conferring upon the corporation power to receive, hold, and dispose of property, to levy taxes, appropriate money, and provide for the payment of the debts and expenses of the city; to establish hospitals, schools, water-works, markets, and erect buildings necessary for the use of the city; to open, regulate, and light the streets; to establish a police, night watch, &c., and to pass all ordinances necessary to carry out the intent of the charter.

It contained, however, no express power to borrow money. But former laws (which were superseded by the charter) had authorized the issue of specific city bonds for that purpose; and such securities were outstanding in 1868, as appeared by an act of the legislature, passed March 16th of that year, by which it was provided that the taxes necessary to pay the coupons and interest on the bonds and funded debt of the city should be kept distinct and should be payable only in legal currency, and no checks or orders of the city were to be received therefor. It was also enacted by the same statute that the amount necessary to be raised by tax for the sinking fund for paying said bonds, and for the support of the public schools, should be paid in the same manner.

The public ordinances of the city were published in a book, and by these it was, among other things, provided that there should be a committee of improvements and expenditures, and that all propositions for improvements, or the expenditure of money, or the incurring of any liability, should be referred to this committee, who were to report to the city council, and that no liability should be incurred unless authorized by existing laws, or by order of the city council, and that no check should be issued by the recorder upon the treasurer, unless by authority of the city council, or in pursuance of existing laws of the corporation.

: The defendant offered proof tending to show that there was no evidence of any authority having ever been given by the city council for the issue or reissue of checks in the manner in which the checks in question were issued and reissued; and that one of them (specified) had been issued in virtue of a corrupt contract with a member of the council.   The proof was rejected under the defendant's exception.

· The court charged in substance as follows: That the charter of Nashville authorized the corporation to issue promissory notes and other securities for lawful debts; that the instruments in question, if signed by the proper officers and given for a good consideration, were, in effect, promissory notes, legal and obligatory; that by long usage the corporation had sanctioned the authority of the officers to issue such instruments; that the purchasers thereof were authorized to presume that they were properly issued; that if it was the usage to reissue these securities by sale in the market, they would, when so sold, be obligatory on the corporation; and, though upon their face overdue, they would be in law payable on demand, and not to be deemed dishonored so as to let in defences against a subsequent holder of the paper, until after the lapse of a reasonable time for making demand; that the reissue and sale of the securities in question by the treasurer of the board of education, if done by the consent and sanction of the mayor, aldermen, and council, made them valid obligations against the city; and that

such consent and sanction might be presumed from the publicity of the transactions, the want of other resources to support the schools, and the other circumstances of the case, without any formal official action taken on the subject; and that the common usage of the finance committee, to pledge the city checks as security for its notes, if known to the corporation, was binding upon it, and that the checks so pledged would be valid in the hands of a purchaser before maturity, not having notice of a premature sale or other irregularity in their issue.

This charge was· excepted to in all its parts, and upon these exceptions the case was argued before this court in reference to the following points:

1. Has a municipal corporation the power, without express legislative authority, to borrow money for any of the purposes of its incorporation?

2. Has it the power, without express legislative authority, to issue its paper clothed with all the attributes of negotiability?

3. Conceding the affirmative of these two queries, can the executive officers of a municipal corporation borrow money, or issue negotiable securities for the corporation, so as to bind it, without "ordinance;" that is to say, without express authority from the legislative department of the corporate government in its collective official capacity?*

The case was elaborately argued, both upon principle and authorities, on these points, by *Messrs. W. F. and H. Cooper, for the plaintiff in error, and by Messrs. G. F. Edmunds and R. McP. Smith, contra;* the latter counsel referring specially to *Adams* v. *The Memphis and Little Rock Railroad Company,* in the Supreme Court of Tennessee,† in which State the transactions now in question arose.

---

* There was no regular assignment of errors in the case, such as is required by the 21st Rule (11 Wallace, ix), and the court was at first indisposed to hear the case. However, by a careful inspection of the brief of the plaintiff in error, the three points here mentioned were considered as being, in substance, assigned, and on them alone the oral argument was made.

† 2 Coldwell, 645.

Mr. Justice BRADLEY delivered the judgment of the court, and the opinion of himself and Justices MILLER, DAVIS, and FIELD; Mr. Justice HUNT concurring in the judgment.

A municipal corporation is a subordinate branch of the domestic government of a State. It is instituted for public purposes only; and has none of the peculiar qualities and characteristics of a trading corporation, instituted for purposes of private gain, except that of acting in a corporate capacity. Its objects, its responsibilities, and its powers are different. As a local governmental institution, it exists for the benefit of the people within its corporate limits. The legislature invests it with such powers as it deems adequate to the ends to be accomplished. The power of taxation is usually conferred for the purpose of enabling it to raise the necessary funds to carry on the city government and to make such public improvements as it is authorized to make. As this is a power which immediately affects the entire constituency of the municipal body which exercises it, no evil consequences are likely to ensue from its being conferred; although it is not unusual to affix limits to its exercise for any single year. The power to borrow money is different. When this is exercised the citizens are immediately affected only by the benefit arising from the loan; its burden is not felt till afterwards. Such a power does not belong to a municipal corporation as an incident of its creation. To be possessed it must be conferred by legislation, either express or implied. It does not belong, as a mere matter of course, to local governments to raise loans. Such governments are not created for any such purpose. Their powers are prescribed by their charters, and those charters provide the means for exercising the powers; and the creation of specific means excludes others. Indebtedness may be incurred to a limited extent in carrying out the objects of the incorporation. Evidences of such indebtedness may be given to the public creditors. But they must look to and rely on the legitimate mode of raising the funds for its payment. That mode is taxation.

Our system of local and municipal government is copied, in its general features, from that of England. No evidence is adduced to show that the practice of borrowing money has been used by the cities and towns of that country without an act of Parliament authorizing it. We believe no such practice has ever obtained.

Much less can any precedent be found (except of modern date and in this country) for the issue, by local civil authorities, of promissory notes, bills of exchange, and other commercial paper. At a period within the memory of man the proposal of such a thing would have been met with astonishment. The making of such paper was originally confined to merchants. But its great convenience was the means of extending its use, first to all individuals, and afterwards to private corporations having occasion to make promises to pay money. Being only themselves responsible for the paper they issue, no evil consequences can follow sufficient to counterbalance the conveniencies and benefits derived from its use. They know its immunity, in the hands of a *bonâ fide* holder, from all defences and equities. Knowing this, if they choose to issue it, no one is injured but themselves. But if city and town officials should have the power thus to bind their constituencies, it is easy to see what abuses might, and probably would, ensue. We know from experience what abuses have been practiced where the power has been conferred. Fraudulent issues, peculations, and embezzlements, and the accumulation of vast amounts of indebtedness, without any corresponding public benefit, have been rendered easy and secure from merited punishment. The purpose and object of a municipal corporation do not ordinarily require the exercise of any such power. They are not trading corporations and ought not to become such. They are invested with public trusts of a governmental and administrative character; they are the local governments of the people, established by them as their representatives in the management and administration of municipal affairs affecting the peace, good order, and general well-being of the community as a political society and district; and in-

vested with power by taxation to raise the revenues necessary for those purposes. The idea that they have the incidental power to issue an unlimited amount of obligations of such a character as to be irretrievably binding on the people, without a shadow of consideration in return, is the growth of a modern misconception of their true object and character. If in the exercise of their important trusts the power to borrow money and to issue bonds or other commercial securities is needed, the legislature can easily confer it under the proper limitations and restraints, and with proper provisions for future repayment. Without such authority it cannot be legally exercised. It is too dangerous a power to be exercised by all municipal bodies indiscriminately, managed as they are by persons whose individual responsibility is not at stake.

Vouchers for money due, certificates of indebtedness for services rendered or for property furnished for the uses of the city, orders or drafts drawn by one city officer upon another, or any other device of the kind, used for liquidating the amounts legitimately due to public creditors, are of course necessary instruments for carrying on the machinery of municipal administration, and for anticipating the collection of taxes. But to invest such documents with the character and incidents of commercial paper, so as to render them in the hands of *bonâ fide* holders absolute obligations to pay, however irregularly or fraudulently issued, is an abuse of their true character and purpose. It has the effect of converting a municipal organization into a trading company, and puts it in the power of corrupt officials to involve a political community in irretrievable bankruptcy. No such power ought to exist, and in our opinion no such power does legally exist, unless conferred by legislative enactment, either express or clearly implied.

There are cases, undoubtedly, in which it is proper and desirable that a limited power of this kind should be conferred, as where some extensive public work is to be performed, the expense of which is beyond the immediate resources of reasonable taxation, and capable of being fairly

and justly spread over an extended period of time. Such cases, however, belong to the exercise of legislative discretion, and are to be governed and regulated thereby. Where the power is clearly given, and securities have been issued in conformity therewith, they will stand on the same basis and be entitled to the same privileges as public securities and commercial paper generally.

But where the power has not been given, parties must take municipal orders, drafts, certificates, and other documents of the sort at their peril. Custom and usage may have so far assimilated them to regular commercial paper as to make them negotiable, that is, transferable by delivery or indorsement. This quality renders them more convenient for the purposes of the holder, and has, undoubtedly, led to the idea so frequently, but, as we think, erroneously, entertained, that they are invested with that other characteristic of commercial paper—freedom from all legal and equitable defences in the hands of a *bonâ fide* holder. But every holder of a city order or certificate knows, that to be valid and genuine at all, it must have been issued as a voucher for city indebtedness. It could not be lawfully issued for any other purpose. He must take it, therefore, subject to the risk that it has been lawfully and properly issued. His claim to be a *bonâ fide* holder will always be subject to this qualification. The face of the paper itself is notice to him that its validity depends upon the regularity of its issue. The officers of the city have no authority to issue it for any illegal or improper purpose, and their acts cannot create an estoppel against the city itself, its taxpayers, or people. Persons receiving it from them know whether it is issued, and whether they receive it, for a proper purpose and a proper consideration. Of course they are affected by the absence of these essential ingredients; and all subsequent holders take *cum onere*, and are affected by the same defect.

We consider these principles to be so sound and fundamental as to make it a matter of some surprise that a different view should have been taken by some jurists of eminent ability. The cases on the subject are conflicting and irrecon-

cilable.   It could not serve any useful purpose to make an elaborate review of them.   We have endeavored clearly and explicitly, though briefly, to state the views which we entertain, and in accordance with which we think the questions in this case must be decided.

Much stress has been laid upon the decision of the Supreme Court of Tennessee, in the case of *Adams* v. *The Memphis and Little Rock Railroad Company.** The mayor and common council of the city of Memphis, under a charter similar to that of Nashville, had mortgaged certain property belonging to the city, called the navy-yard property, which had been given to it by the United States for the use and benefit of the city, to secure the payment of $300,000 of the bonds of the Memphis and Little Rock Railroad Company.   The road of this company extended from a point opposite the city to Little Rock, in Arkansas, and was deemed of great advantage to the city of Memphis.   The rents and profits of this property were also appropriated by the mortgage to the payment of the interest on the bonds thus secured, and to the raising of a sinking fund to meet the principal when due; and authority was given to the trustees of the mortgage to enter and lease, or sell in case of default in the payment of interest or principal.   The court held that the general power contained in the city charter to sell, lease, and dispose of the property of the corporation for the use and benefit of the city, authorized this transaction; and that the purpose for which the mortgage was given was a proper corporation purpose within the meaning of the charter.   Other doctrines were propounded in the opinion of the court in reference to the implied powers of municipal corporations, which were not necessary to the decision of the case, and need not be adverted to here.   The decision itself does not, in our apprehension, necessarily conflict with the views which we have stated above.   We proceed, therefore, to the consideration of the particular facts of this case.

* 2 Coldwell, 645.

The eighteen checks purchased of the treasurer of the board of education will be first considered. In the absence of proof to the contrary, it may be presumed that they were properly issued at their inception. Evidence was offered by the defendants, it is true, tending to show that they had not been issued in accordance with the laws and ordinances of the city. But the view which we have taken of their reissue and sale by the treasurer of the board of education, renders it unnecessary to consider that aspect of the case. It is conceded that they had been received by the collector in payment of taxes due to the city. As evidences of indebtedness, where this was done, they were *functus officio.* They were paid and satisfied. They ceased to have any validity. They could not be reissued without the authority of the city council. Certainly the treasurer of the board of education had no authority thus to reissue them or sell them. Such an authority would render him controller and dispenser of the city credit. If he had authority to sell them for one price, he had authority to sell them for another; and there is no limit to which he would thus have power to involve the city in debt. Nor can the purchaser waive his claim to recover the amount of the checks, and demand a reimbursement of the money which he actually paid. Considered as a money transaction, and not as a purchase of the paper, it would amount to a loan and borrowing of money on the city account. And where can authority be found for the treasurer of the board of education to borrow money on account of the city? The city council may, no doubt, assume the responsibility of the transaction and make proper provision, as perhaps in equity ought to be done, for the repayment of the money so advanced. But the transaction had not the support of legal authority, and hence the money cannot be recovered in this action.

The remaining check of $1000, purchased from Sax, was pledged or hypothecated, with fifteen others of like amount, to Sax as collateral security for a loan of $12,000, payable in four months. This loan was secured by a note given at the same time, which recited the pledge or hypothecation of the

sixteen checks, and gave Sax power to sell them if the note was not paid at maturity.   Sax, instead of waiting to see if the note would be paid, sold the checks thus pledged, or at least the one in question, within a week after the loan was effected.   This, of course, was not only an unauthorized, it was a dishonest transaction, and could give no title to the purchaser as against the city.   In the first place the finance committee, or its chairman, had no legal authority thus to pledge the evidences of city indebtedness and give to the pledgee the power of selling the same for any price he could get.   In this way an untold amount of debt could be piled up against the city without any adequate consideration received therefor, and all the evil consequences before adverted to would be liable to follow the exercise of such a power.   This very instance forcibly illustrates the mischievous results that would follow from inferring an incidental power in a municipal corporation to issue commercial securities.   The check in question has the same form and appearance as all the other checks which the city officers are in the habit of issuing for ordinary city indebtedness.   It must be subject to the same general rule of being valid or otherwise, according as it was properly or improperly, lawfully or unlawfully, issued.   And the subsequent holder, whether purchaser or otherwise, takes it with all the original defects of title.

The judgment must be reversed, and a *venire de novo* awarded.

Mr. Justice HUNT: I concur in the judgment of this court reversing the judgment at the circuit, and remanding the case for further proceedings.   I do not, however, concur in some of the grounds upon which the reversal is placed in the opinion delivered by Mr. Justice Bradley, and as my concurrence is necessary to the rendering of the judgment, there is a manifest propriety in an expression of the grounds of my concurrence.

I am of the opinion that the judge erred in charging and deciding that if the checks " are, upon their face, overdue

at the time of such sale (that is their reissue and sale), they will be in law payable on demand, and are not to be deemed dishonored so as to let in defences between the company and a subsequent holder of the paper until after the lapse of a reasonable time after their reissue for the making of such demand." All of the checks in question had been presented for payment. Payment was not made, but the time of presentation was noted in each instance, and interest was allowed upon the check from that date. The presenta-. tion and neglect to pay had been made in some instances nearly four months before such purchase, and the time of such presentation was noted upon the check by the city treasurer, and it bore interest from that date. A check re-quires no presentment for acceptance as distinguished from presentment for payment. If once presented and payment refused, it is dishonored.* To constitute a *bonâ fide* holder of a note or check it is necessary—1. That it should have been received before maturity; 2. That a valuable consideration should have been paid for it; and 3. That it should have been taken without knowledge of the defences sought to be made.

Whatever defences could properly be made to these checks in the hands of the original holder could be made while they were in the plaintiff's hands. He was not a *bonâ fide* holder.

Evidence to show fraud or corruption, or want of authority in their issue, should have been received at the circuit, and in excluding the offers made on that subject and in the charge in reference to the evidence given, I think there was error. Thus, the Sax check, it was alleged, had been issued without authority, hypothecated to secure a note of the city made without authority, and sold in violation of the terms of the hypothecation. It was open to this defence in the hands of the plaintiff.

In the case of another check it was offered to be proved that it was issued without authority and upon a corrupt contract, but the evidence was excluded.

---

* Chitty on Bills, 272, m.

The court in another place charged the jury that "if it is the usage to reissue the securities by sale in the market, they will, when so sold, be obligatory upon the corporation." I cannot think that it is lawful for a municipal corporation to issue its checks, pay them, reissue them, and repeat this operation as often as its convenience requires. This comes too near the character of a bank of issue and deposit.

In the particulars following, my views are different from those expressed in the opinion of Justice Bradley.

I hold it to be well established by the authorities that a municipal corporation may borrow money for the legitimate use of the corporation, and that it may issue its notes for the same unless expressly prohibited by its charter or by statute from so doing. The proposition that it cannot borrow money, unless by its charter expressly authorized to do so, is, in my opinion, unsustained by sound authority.*

That the securities thus issued by municipal corporations are subject to the rules of commercial law when held by a *bonâ fide* holder has been repeatedly held by this court. Every recent volume of its reports contains authorities to this effect. The authorities of the State of Tennessee sustain these general views.†

Checks of the city were issued for the payment of particular debts, and when paid should, no doubt, under ordinary circumstances, have been cancelled. A reissue of a paid check is an extraordinary proceeding. If done by an officer without the authority of the common council, it is a gross violation of duty. If with that authority, it is a loose practice, liable to abuse. Whether such reissue would be an act of positive illegality, *ultra vires* merely, or a bad practice simply, it is not necessary to decide. In neither case can the city repudiate the transaction. It is upon this point

---

* Whitewater Valley Canal Company *v.* Vallette, 21 Howard, 424, and see 1 Dillon on Municipal Corporations, §§ 82, 83, and notes, where the authorities are collected both from the State courts and from this court

† Adams *v.* The Memphis and Little Rock Railroad Company, 2 Coldwell, 645.

chiefly that I desire to express my dissent from the opinion just delivered. As to all the checks in question, the record shows that they were paid over by the collector of city taxes to the treasurer of the board of education, that they were by him sold to McCrory, at eighty cents on the dollar, and that the proceeds of such sales were applied to the uses of the city by an immediate payment of the wages due to the teachers in the public schools of the city. The city received this money upon the reissue of its checks. So far as McCrory is concerned, or the plaintiff who succeeds to his rights, the city now has the money in its treasury.

It is a general rule, applicable to all persons and corporations, and is a dictate of plain honesty, that whoever, knowing the facts of the case, retains and uses money received by an agent for his account, cannot repudiate the contract on which it is received.* Putting this transaction most strongly against the plaintiff, by assuming that this reissue was not *ultra vires* merely, but was positively prohibited by law, the city is still responsible to the holder of the checks for the money it has received and still retains. Conceding the illegal contract to be void, as forbidden by the legislature, it is to be remembered that the prohibition is upon the city only, and not upon the person dealing with it; the illegality is on the part of the city, and not of the person receiving the checks. The contract may well be void as to the city, and its officers punishable for the offence of making it, and yet it may stand in favor of innocent persons not within the prohibition. Such was the decision in *Tracy* v. *Talmage*,† in *Curtis* v. *Leavitt*,‡ and in *The Oneida Bank* v. *The Ontario Bank*.§ The latter case was briefly this: The general banking law of New York prohibited the issuance by a bank of a certificate of deposit payable on time. The cashier of the Ontario Bank received $5000 in cash from one Perry, and delivered to him a certificate of deposit post-dated about four weeks, for the purpose of raising funds for the bank.

---

* Bissell *v.* City of Jeffersonville, 24 Howard, 300; Sedgwick on Statutory and Constitutional Law, 90.

† 14 New York, 162.          ‡ 15 Id. 9.          § 21 Id. 490.

This draft Perry transferred to the Oneida Bank, who brought suit upon it. It was held, assuming this draft to be void, that the party making the contract could reject the security and recover the money or value which he advanced on receiving it. It was held further, that the right of action to recover this money passed to the Oneida Bank upon the transfer of the certificate to them. The plaintiff recovered the money advanced to the bank upon the illegal certificate. Both of these principles were held with equal distinctness in *Tracy* v. *Talmage, supra.*

They seem to me to be decisive of the right of the plaintiff to recover upon the checks, regarding them in their most unfavorable aspect, the amount of money advanced to and yet held by the city.

For the reasons thus presented, I concur in the reversal of the judgment.

JUDGMENT REVERSED, and a
VENIRE DE NOVO AWARDED.

Mr. Justice CLIFFORD, dissenting:

I dissent from the opinion and judgment in this case, chiefly upon two grounds: (1) Because I think the opinion restricts quite too much the powers of municipal corporations; and (2), because the doctrines of the opinion, as applied to negotiable securities of a commercial character, are repugnant to the well-settled rules of law established by the repeated decisions of this court.

Mr. Justice SWAYNE and Mr. Justice STRONG also dissented.

---

NOTE.

AT the same time with the preceding case, and by the same counsel, was argued the case of

THE MAYOR v. LINDSEY.

In error to the same Circuit Court, for the Middle District of Tennessee. In this case Lindsey sued the mayor of Nashville

on certain checks, similar in all respects, in form and inception, to the check issued to Julius Sax, and mentioned more particularly *supra*, p. 472. The checks now sued on had been pledged as collateral security for a loan of less amount than the checks pledged, and were sold soon after being pledged, and before the loan fell due; the transaction being effected by the chairman of the finance committee of the city council without other authority. Such at least was the tendency of the evidence, and the judge charged substantially as in the preceding case of Ray.

Mr. Justice BRADLEY announced the judgment of this court, REVERSING THE JUDGMENT BELOW, with directions to award a

VENIRE DE NOVO.