DEXTER HORTON TRUST & SAVINGS BANK v. CLEARWATER COUNTY et al.

(District Court, D. Idaho, C. D. July 29, 1916.)

1. COUNTIES ⬡167—WARRANTS—EFFECT OF TRANSFER.

County warrants are not negotiable paper, in the sense that a transferee for value is protected from a defense available against the original payee.

[Ed. Note.—For other cases, see Counties, Cent. Dig. § 249; Dec. Dig. ⬡167.]

2. COUNTIES ⬡57—COUNTY BOARDS—POWERS AND FUNCTIONS—CONCLUSIVENESS OF ACTION.

Where county commissioners have in good faith acted on a matter within their jurisdiction, and no appeal is taken as provided for by statute, their order becomes final, and is not subject to collateral attack.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 74, 75; Dec. Dig. ⬡57.]

3. COUNTIES ⚙️⟶113(6)—CONTRACTS—POWERS OF COUNTY BOARD.

Const. Idaho, art. 18, § 6, provides for the election biennially of a county assessor, whose duty it shall be to value all property in the county for purposes of taxation. Rev. Codes Idaho, § 2119, as amended by Sess. Laws 1913, c. 127, authorizes the board of county commissioners, on application by the assessor and after a hearing on 30 days' public notice, to empower the assessor to appoint such deputies and clerks as the business of his office may require and to fix their compensation. *Held*, that under such provisions, while the board is also charged with the duty of equalizing assessments, it is without authority to enter into a contract with an outsider to cruise the taxable timber lands of the county at a large expense, and to make reports which would not have any official or legal status, and could not properly be followed as authentic, either by the assessor or the board, and that such a contract is invalid.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 174, 180; Dec. Dig. ⚙️⟶113(6).]

4. COUNTIES ⚙️⟶152—CONTRACTS—POWERS OF COUNTY BOARD—CONSTITUTIONAL RESTRICTIONS.

Such a contract, creating a liability of the county greater than its entire income for the year, and for the discharge of which no revenue was provided, is also void under article 8, § 3, of the Idaho Constitution, which provides as follows: "No county * * * shall incur any indebtedness or liability, in any manner or for any purpose exceeding in that year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose. * * * Any indebtedness or liability incurred contrary to this provision shall be void: Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general law of the state."

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 215–217; Dec. Dig. ⚙️⟶152.]

5. COUNTIES ⚙️⟶150(2)—LIMITATION OF INDEBTEDNESS—"ORDINARY EXPENSE"—"NECESSARY EXPENSE."

Within the meaning of Const. Idaho, art. 8, § 3, prohibiting counties from incurring indebtedness or liability in any year exceeding the income and revenue provided for such year, unless certain designated conditions are complied with relative to authorization of the debt and provision made for its payment, but providing that the restriction shall not apply to "the ordinary and necessary expenses authorized by the general law of the state," an expense is "ordinary" if it is in an ordinary class, if in the ordinary course of the transaction of municipal business or the maintenance of municipal property it may and is likely to become necessary; and it will be assumed that if by law a specific duty is imposed, and the mode of performance is prescribed, so that no discretion is left with the officer, the expense necessarily incurred in discharging the duty is a "necessary expense."

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 165, 166, 216; Dec. Dig. ⚙️⟶150(2).

For other definitions, see Words and Phrases, First and Second Series, Ordinary Expenses; Necessary Expenses.]

6. COUNTIES ⚙️⟶149—FISCAL MANAGEMENT—"VOLUNTARY INDEBTEDNESS"—"INVOLUNTARY INDEBTEDNESS."

A "voluntary indebtedness" of a county is one which it is at liberty to evade or postpone until means are provided for the payment of the expenses incident thereto; while an "involuntary indebtedness" is a lia-

bility imposed upon a county by law, and which it is not privileged to evade or postpone.

[Ed. Note.—For other cases, see Counties, Cent. Dig. § 214; Dec. Dig. ☞149.

For other definitions, see Words and Phrases, Second Series, Voluntary Indebtedness.]

In Equity. Suit by the Dexter Horton Trust & Savings Bank against the County of Clearwater, Idaho, and Oren D. Crockett, Treasurer of said County. Decree for defendants.

Geo. W. Tannahill, of Lewiston, Idaho, Peters & Powell, of Seattle, Wash., and H. B. Beckett, of Portland, Or., for plaintiff.

Fred E. Butler, of Lewiston, Idaho, and John R. Becker, of Orofino, Idaho, for defendants.

DIETRICH, District Judge. The plaintiff holds by assignment warrants of the defendant county in the principal sum of $44,072.69, which were issued in 1914 to one M. G. Nease in final payment of a contract dated April 15, 1914, for the cruising of its timber lands for taxation purposes. Altogether Nease cruised 503,997 acres, at the contract price of 12½ cents per acre. The first warrants issued were paid in due course, and all those now outstanding are here involved. The county treasurer, questioning their validity, declined payment, and threatened to divert to the discharge of later warrants all the funds in his hands, whereupon the plaintiff brought this suit for an injunction to restrain him from carrying out his purpose, and requiring him to recognize and pay all warrants in the order of their issuance. Several defenses are interposed. It is charged: (1) That the contract was the result of a collusive and corrupt agreement between Nease and the county commissioners; (2) that the claims upon which the warrants were issued were, pursuant to such fraudulent and collusive understanding, wrongfully allowed; (3) that the contract was improvidently entered into by the board, and the price agreed to be paid was excessive; (4) that the contract was never substantially performed by Nease; (5) that in part the warrants cover claims for the cruising of lands which were not within the terms of the contract; (6) that under the laws of the state of Idaho the subject-matter of the contract is not within the jurisdiction of the board of county commissioners; (7) that the action of the board in letting the contract is violative of section 3 of article 8 of the Constitution of the state, in that the expense is greatly in excess of the revenues provided in the year for which it was incurred, and it was not authorized by a vote of the electors of the county, and was not an ordinary and necessary expense; (8) that upon their face the warrants are so defective in form that the treasurer is not bound to recognize them; and (9) that the treasurer is without authority to pay them, because the claims for which they were issued have never been certified as required by law.

I do not attempt to review the evidence upon the issue of collusion or conspiracy. It is necessarily circumstantial, and, as is usually the case, it takes a wide range and is voluminous. Though the view may be entertained that the commissioners acted improvidently and were wanting in vigilance and care, I am convinced that they were not ac-

tuated by corrupt motives. The inculpatory circumstances surrounding the letting of the contract may all reasonably be referred to their inexperience in public affairs, and their real, even though somewhat grotesque, fear of the so-called "timber companies"; and likewise their want of vigilance in requiring strict performance and their complacence in allowing the claims as presented may very well be explained by their confidence in and reliance upon the assessor's approval, and their apparent assumption, so generally indulged by the unsophisticated, that the sworn verification of a claim against the public is a sufficient guaranty of its correctness.

There is a measure of interdependence between the next two defenses that makes it desirable to consider them together. The defendants contend that the agreed rate of 12½ cents per acre was an excessive price to pay for cruising, and that in material respects the contractor failed to render the service called for by the terms of the agreement. I am inclined to think that one contention or the other, if not both, must be sustained, for the record leaves no doubt in my mind that 12½ cents per acre is greatly in excess of a reasonable compensation for that which was actually done.

From an examination of the record made by the board of commissioners at the time the contract was let, and a consideration of the manner in which it was gotten up, it is clear that the board expected a thorough and accurate cruise, and that Nease convinced them that that was the kind of cruise he would make. In his written offer, which was accepted, he proposed to make "a very careful" cruise, and the contract calls for "a careful, complete, and thorough" cruise. Can we say that the requirement of thoroughness was met by a cruise made through the employment of the cheapest and least thorough of all recognized methods, or that the requirements of carefulness and completeness were satisfied when the areas daily covered by the cruisers were of unusual, if not extraordinary, extent? The question is suggestive of but one answer. When we consider that for a fairly reliable cruise the double run system is most commonly employed, and that the spring cruise here was generally made in that manner, and when we further consider the fact that the topographic notations were so placed upon the maps as to signify that a double run was in fact made, and further that the price paid was, to say the least, adequate fully to pay for such a cruise, it is difficult to escape the conclusion that at the time the contract was entered into both parties contemplated a double run. It is of no avail to say that upon averaging up large areas the cruise made will give a fair approximation of the aggregate. It may also be true that a rough estimate of most of the lands would, in a general average, approximate the result of a single run cruise, and it may be that either would enable the assessor to make as fair a valuation of the timber lands as is commonly made upon other classes of property. But that is not what the county contracted for. It could have gotten a rough estimate or a hasty single run cruise for a fraction of what it agreed to pay, and whether the action of the board be deemed to be prudent or imprudent in contracting and agreeing to pay for details and a degree of accuracy the value of which is

more apparent than real, the county is entitled to receive what it is asked to pay for.

[1] The question still remains whether the defendants can now avail themselves of this defense, and in considering it we shall assume that, while the plaintiff purchased the warrants in the open market for value, it holds them subject to all the defenses which would be available against the original payee. Abbott's Public Securities, § 450; City of Nashville v. Ray, 86 U. S. 468, 22 L. Ed. 164; Wall v. County of Monroe, 103 U. S. 74, 26 L. Ed. 430. There is no charge in the answer that the county commissioners were deceived, or that they were fraudulently induced to audit and allow the claims and order the issuance of the warrants. Upon the other hand, it is expressly alleged that, notwithstanding complete knowledge of the inadequacy of the cruise and its inaccuracies, the board deliberately allowed the claims. While I do not think this averment of complete knowledge is substantiated by the evidence, and while there are certain circumstances, especially that of the misleading "elevation notations," tending to show a purpose on the part of the contractor to deceive, plainly in the face of the express charge of the possession of full knowledge by the board we are not now at liberty to find that the issuance of the warrants was induced by fraud. The fact that the board did not exact strict performance is not conclusive. If they had the power to make the contract, they also had the power to waive some of its provisions.

[2] In the absence of fraud or collusion, the courts cannot, in an action of this character, revise the discretion of the board touching matters within their jurisdiction. Against the improvidence and folly of county commissioners the taxpayer's remedy is by way of appeal to the courts as provided by statute, and that remedy is simple, inexpensive, and ordinarily adequate. Such an appeal was here taken by Lewis. Doubtless feeling the strain at this point, the defendants allege that by a collusive understanding between Nease and the county commissioners and Lewis that suit was fraudulently kept alive until the time for other taxpayers to appeal had expired, and then was dismissed, all for the purpose of deceiving the other taxpayers and inducing them to remain inactive. But this contention cannot be sustained. There never was an understanding on the part of either Nease or the commissioners that the appeal should be taken, or that it should be maintained after it was taken. Doubtless the board desired that it be dismissed, and in that there was no impropriety. Administrative discretion must be lodged somewhere, and after a board of county commissioners has in good faith acted upon a matter within its jurisdiction, though carelessly and improvidently, and no appeal is taken, the order becomes final, and is not subject to collateral attack.

The fifth defense is that in part the warrants cover claims for the cruising of lands which are not within the terms of the contract. The facts under this head are simple, and practically undisputed. The contract calls for the cruising of the patented timber lands of the county. Upon the plats returned by Nease it is shown that his claims covered, and warrants were issued for, a little more than 110,000 acres of untimbered lands. In this total acreage it is found that there

are legal subdivisions, wholly devoid of timber, aggregating 35,762 acres. It is also shown that the allowed claims covered 7,680 acres of untimbered government lands (these are embraced in the 35,762 item), and 26,706 acres of timbered government lands, none of which were taxable prior to January 1, 1915, and to most of which no private claim of any kind had been initiated. It is also shown that included within the total amount for which charge was made there were approximately 4,400 acres of lands belonging to the state of Idaho, which were entirely free from any private claim and were nontaxable.

As to this last group, the plaintiff concedes that the contractor should not have been paid therefor, and the only explanation offered is that the lands were cruised and included, and the claims presented, through inadvertence.

As to the 26,700 acres of government land, it appears that some time after the contract was executed, in an informal manner, some, and possibly all, the members of the board of county commissioners assented to a suggestion that in the course of the cruise isolated tracts of government land might be included. No record was ever made of such understanding, but at the time the bills were allowed the board understood that they covered some government lands, though it is doubtful whether they were conscious of the magnitude of the aggregate amount. The 110,000 acres of untimbered lands are scattered throughout the timbered section of the county, ranging from a very small acreage to tracts now and then exceeding a section in extent. Inasmuch as the condition of these lands is disclosed by the plats and reports made by Nease, it must be assumed that the commissioners had knowledge thereof, and with such knowledge allowed the claims. While, therefore, we may dissent from the judgment of the board in paying at the rate of 12½ cents an acre for a report upon such lands, the allowance of the bills with knowledge of the facts must be deemed to be conclusive upon the county, unless, in view of principles later to be discussed, it is held that such action was ultra vires. The government land and state land warrants are subject to similar considerations, and their status also will later receive attention.

The other four defenses are largely concerned with questions of law, and involve no controverted facts other than those already discussed. The defendants first contend that the matter of valuing property for assessment purposes is by the Constitution and the statutes of the state vested exclusively in the assessor, and that a way is provided by which he can have the assistance of such deputies and clerical service as will enable him properly to perform the duties of his office, and that it is the function of the board of commissioners to prescribe and provide the compensation to be paid for such assistance. It is pointed out that in the present case the contractor and his cruisers were nonresidents of the state, and that none of them ever qualified or was entitled to qualify as an officer of the county, and that the cruise has no legal status and cannot be accepted as a valuation for assessment purposes, and is binding upon neither the assessor nor the taxpayer. It is argued that the Constitution and statutes having imposed upon a certain officer the duty of making the assessment, and having prescribed

the method in which the duty is to be performed, and provided the means by which the officer charged with the duty can secure the requisite assistance, such method and means should be held to be exclusive. Blomquist v. Board, 25 Idaho, 284, 137 Pac. 174.

[3] With certain qualifications I am inclined to think that the position must be sustained. The county commissioners also sit as a board of equalization, and as such board it is their duty to equalize valuations in their county, to the end that every kind of property shall bear its just burden of taxation. When we consider this important function, and their further general duty as a board of commissioners to exercise supervision over the county's interests, it will be going too far, I think, to hold that they are wholly without authority to incur expense in securing information which will enable them intelligently to perform these functions. But upon consideration I have been constrained to the conclusion that this power does not extend so far as to warrant them in having the assessor's work done in any way other than that prescribed by law. The record here leaves no doubt that the primary purpose for which the cruise was made was for the assessor's use. The Constitution of the state (section 6 of article 18) provides for the election biennially of a county assessor, whose duty it is to value all property in the county for assessment purposes. Section 2119 of the Revised Codes, as amended in 1913 (Session Laws, p. 474), authorizes the board of county commissioners to empower the assessor to appoint such clerical assistance and such deputies as the business of the office may require, and to fix their compensation. It is further provided, however, that such power may be exercised only upon the application of the assessor after 30 days' public notice. If, after such notice, upon a hearing, at which any taxpayer may appear in opposition, the board finds an existing necessity, it may grant the application.

Now, what reason can be assigned for ignoring this method, and, by resorting to the one here employed, depriving the taxpayers of the statutory right to be heard? Admittedly no sudden emergency had arisen. Assuming that a cruise was needed, why could it not as well have been made under the direction of the assessor, by qualified deputies appointed for that purpose? Possibly the assessor was not himself an experienced cruiser; but neither was Nease. Presumably, in appointing his deputies and clerks, the assessor selects persons qualified for the particular duties to which they are assigned. One man may be expert in the matter of valuing farm lands, and another may have had experience exclusively with values of city property. The assessor in this particular case was an intelligent business man, a banker, and, so far as appears, was qualified to select competent clerical assistance, and experienced cruisers as deputies. There would thus have been no motive for slighting the work, and no occasion for conferences with the large taxpayers as it progressed. And when it was completed the result would have had the sanction of law and a legal status. Whether it could or could not thus have been done more cheaply is perhaps immaterial to the present inquiry, but I have no doubt that a great saving could have been made. And of what value will this contract cruise be to the county? What use can be made of it?

Technically, it is true, it does not constitute an assessment, and in form it is therefore not obnoxious to the objection that it was unofficially made; but when we consider the substance rather than the form, does it not in effect constitute the assessment? In order to sustain the validity of the warrants against attack upon a different ground, the plaintiff has uniformly contended, and now contends, that the cruise is indispensable to the assessor. He cannot, so it is claimed, place a valuation upon the timbered lands without it; it is practically his only source of information. If this be true, manifestly these unsworn, unofficial, nonresident cruisers have, in effect, if not in form, fixed the value of this vast acreage of timbered land for assessment purposes. The assessor sits in his office, and, imputing verity to the information thus furnished him, values the land accordingly. He can exercise no judgment or discretion, for by hypothesis his office knows no facts other than those disclosed by these reports. The assessment comes to be a matter of making certain computations and entering the result thereof upon the assessment book, merely a clerical function. Plainly, therefore, by this contract the interests both of the public and of the taxpayers were in effect committed to nonresident cruisers, unofficially employed, without official responsibility, and exempt from official direction or control.

It is not suggested by the plaintiff that the reports would constitute competent evidence in any statutory proceeding or judicial hearing. That being so, the board of equalization could not properly weigh them as against a proper showing made by a taxpayer in his effort to reduce or prevent the increase of a proposed valuation of his property. It would seem, therefore, that the reports could be legitimately used only for the purpose of suggesting the possible need of investigation; that is, if they differ materially from the valuations which the assessor has been or is placing upon certain lands, the discrepancy may justify the board of equalization in making an investigation for the purpose of ascertaining the facts. Thus indirectly the cruise, if found to be reasonably accurate, would be of some assistance to the commissioners in the performance of their duties. But it is not thought that this indefinite benefit, small as compared with that of a cruise made through official channels, can be accepted as the basis upon which to rest the validity of the contract. Had the work been carried on by the assessor and his deputies, the commissioners might very well have been justified in employing a reasonable number of cruisers to check up the estimates. They would thus have been performing their duty of supervising and correcting, but would not have been doing, the work of the assessor.

[4, 5] We now come to a consideration of the question of the seventh defense; that is, that the contract was entered into in violation of section 3 of article 8 of the Idaho Constitution. That section is as follows:

"No county, city, town, township, board of education, or school district, or other subdivision of the state shall incur any indebtedness, or liability in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified

electors thereof, voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state."

It is admitted that the contract created a liability for the discharge of which no revenue at all was provided during the year 1914, and that it was never authorized by the qualified electors of the county, and further that no provision was ever made for the annual payment of interest or for a sinking fund. In short, the plaintiff concedes that unless the expense thus incurred is an "ordinary and necessary" one, and hence falls within the proviso of section 3, the entire transaction, including the warrants, was and is void. The one question for consideration, therefore, is whether it was an ordinary and necessary expense. Unfortunately this phrase does not yield itself to a comprehensive, general definition, and each case must be adjudged in the light of its own facts. The uncertainty in which this view leaves the fundamental law is to be deplored, but the courts cannot be expected to make specific that which the constitutional convention found it necessary to leave general.

That some of the work for which the warrants were issued was not "necessary" in any reasonable sense in which that word may be used is hardly open to argument. Even were we to accept the plaintiff's view, that a cruise was required to enable the county officers to make an assessment of timbered lands, some of the lands reported were not assessable in 1914, and some of them were not timbered, and, however liberally we may construe the constitutional phrase, manifestly there was no present necessity in 1914 for incurring the expense of cruising such lands. To say that some of the 26,706 acres of government land might or probably would become taxable in the future is aside from the point. There was no present necessity, and the constitutional proviso contemplates present necessities, and not future possible economies. And why cruise an untimbered section—or, for that matter, an untimbered 40—unless the position be taken·that it was necessary to send timber cruisers out over all of the lands of the county? It was quite immaterial that an untimbered section was surrounded by timbered sections. The contractor was sent out to cruise the timbered lands, and it was thus his duty to locate by legal subdivisions all the timbered lands, but not those which were untimbered. What need had he for reporting that a certain section had no timber upon it? If, in compliance with his instructions, he faithfully performed his contract, and cruised and returned reports to cover all timber lands in a given township, nothing more was required. The county officers were then advised by implication that the other lands of the township not so reported were untimbered, and the assessor, already having their description, could value them as he valued other untimbered lands in the county. Surely it was not necessary for the

contractor to survey the untimbered lands to find out where the timber was; he could see the timber, and, seeing it, it was his duty to cruise it and report the amount thereof, and further to report where it was, and not where it was not. The mere fact that in running the lines of the timbered lands he incidentally and necessarily ran some of the lines of the nontimbered lands did not warrant him in claiming a cruise of the latter, and, even were there no constitutional limitation, the allowance of such a claim constitutes gross extravagance. It follows that, the expense being unnecessary, and there being no funds applicable to its payment, the board was clearly without the power under the Constitution either to incur or to pay it, and in so far, therefore, as they cover payment for the cruising of these three groups of land, aggregating 141,106 acres, the warrants would seem to be void in any rational view that may be taken of the scope of the constitutional proviso.

The status of the balance of the claim is not so free from doubt. The plaintiff's position in substance is that the phrase "ordinary and necessary" must be given a liberal construction; that it is the duty of the county commissioners, as well as the assessor, to classify and assess all lands in their county at their actual cash value (Laws Idaho 1913, c. 58, §§ 34, 37, 38, 39, 48, 49, 56, 57, 58, 64, 65, 66, 68); and that, such duty being imposed, the expense reasonably incurred in its performance must be deemed to be an ordinary and necessary one. It will be assumed that an expense is not necessarily extraordinary because the necessity therefor does not arise frequently and at regular intervals. Hickey v. Nampa, 22 Idaho, 41, 124 Pac. 208. An expense is ordinary if it is in an ordinary class, if in the ordinary course of the transaction of municipal business, or the maintenance of municipal property, it may and is likely to become necessary. It will further be assumed that if by law a specific duty is imposed, and the mode of performance is prescribed, so that no discretion is left with the officer, the expense necessarily incurred in discharging the duty is a "necessary expense."

Referring to these principles, the plaintiff contends that the officers of the defendant county could not perform the duties imposed upon them of classifying and valuing the timbered lands without a cruise. It is true that the statutes do require of the assessor that in assessing the property of the county he "shall actually determine, as near as practicable, the full cash value of each tract or piece of real property assessed." It is also required that for assessment purposes all lands shall be classified as agricultural, timbered, cut-over, mineral, grazing, and waste land. It is also made the duty of the county commissioners, sitting as a board of equalization, to consider all assessments made by the assessor, and to so increase or reduce his valuations that they will conform to the actual cash value of the property. Likewise it is their duty to acquire correct classifications of the lands. It is further provided that, if a county commissioner "knowingly permits" a valuation to remain too high or too low, he is guilty of a misdemeanor and of malfeasance in office. It is still further provided that:

"Any assessor who shall willfully or knowingly enter, or suffer to be entered, any untrue or incorrect classification of lands or other property upon the assessment roll; or any member of any board of county commissioners who shall knowingly permit any such untrue or incorrect classification of property to stand; or any county auditor who knowingly make an untrue or incorrect classification of the property, as entered upon the assessment roll, in his abstract of the assessment, or fail to transmit his abstract of the assessment within the time prescribed therefor in the preceding section, shall forfeit the sum of one thousand dollars, to be recovered upon his official bond for the use of the state."

Now it must be manifest that to construe these several requirements as imposing upon the officers the duty of absolute accuracy in the classification and valuation of lands is to ignore certain qualifying phrases, and is to make compliance with the law wholly impossible. An entirely just or correct valuation of all the property in the county, if not a mere dream, is an unattainable ideal. The difficulty with the plaintiff's argument is that it goes too far. If the expense of the cruise is to be deemed to be a necessary expense only because the officers must assess with absolute accuracy and the cruise will enable them to perform this duty, the answer is that the cruise is without such efficacy. Admittedly it is inaccurate, and as to any given legal subdivision the report furnished the county may not even approximate the truth. The most that can be said is that the work will give some measure of assistance, and that valuations made upon the basis of the cruise will, on the whole, be less inaccurate than one made without such a cruise.

Enough has been said in this regard to illustrate the point. Obviously it is not a case where there has been imposed a definite, specific duty which is susceptible of perfect performance, and which is to be discharged in a mode particularly pointed out. The assessor is to determine *"as near as practicable"* the full cash value. If an officer shall *"knowingly or willfully"* assess or permit to be assessed property at more or less than its cash value, he shall be punished. Such is the purport of the law. In short, the officers are to do the best they can, with the means at their disposal, to approximate as nearly as may be the unattainable ideal.

The point may further be illustrated by reference to conditions of which we may take judicial knowledge, as well as facts disclosed by the evidence. The act of 1913 did not establish a new system. It has always been the duty of the officers to assess real property under a uniform rule of valuation, and, except for a short period, at its full cash value. The principle has always been the same, and the duties of the assessor and of the board of equalization have always been substantially the same. Yet notwithstanding 25 years of statehood only three or four counties have ever had cruises made, and none until the last 4 or 5 years. Now, will it be contended that every assessor and every county commissioner in ever county for these many years has been guilty of a misdemeanor and of malfeasance in office because he has valued, and equalized the valuations of, property as best he could without such cruises? Or would any one say that the assessor of the defendant county and the commissioners were likewise guilty

235 F.—48

because the very year this obligation was incurred they valued these identical timber lands, and equalized the valuation thereof, and levied taxes, without this or any other cruise? As a matter of fact, the duty of assessing timber lands according to their actual cash value does not differ in kind from that of assessing other classes of lands. In any case the task is attended with difficulty, and at most the difference is one of degree and not of kind. The same reasons which are urged in support of a cruise of timber lands may be urged with but little less force in favor of a detailed survey of agricultural lands, with a report upon the topography thereof, the soil conditions, the irrigating systems, water supply, location with reference to market, schools, roads, etc., all of which and other conditions are taken into consideration when it comes to determining the actual market or cash value of such lands. But will any one say that assessors and their deputies possess or use such detailed information? Could not an experienced timber man, acting as deputy assessor, go through the woods, with a compassman to locate the legal subdivisions, and, without a detailed cruise, but upon a general survey and estimate, appraise the value of timber lands quite as accurately as the ordinary deputy assesses agricultural lands? And will any one assert that the three county commissioners, sitting as a board of equalization, have any detailed or personal knowledge of the conditions which must be taken into consideration in determining the actual cash value of the majority of the agricultural lands in their county? Could any one of them qualify as an opinion witness touching the value of ten per cent. of such lands, if called to the stand in a proceeding in eminent domain? If they are honest, they do the best they can with the means at their disposal, and thus they discharge their duty, not because the result is accurate, but because they determine the "full cash value" "as nearly as practicable," and neither knowingly nor willfully assess or permit to be assessed property for more or less than its actual cash value. That is the statutory measure of their official duty, and they cannot, in the face of the express prohibition of the fundamental law, defend the creation of an indebtedness, exceeding in itself the total revenues of the county for the year, upon the ground that thereby they will be enabled to perform this duty a little more efficiently.

The Idaho Constitution is imbued with the spirit of economy, and in so far as possible it imposes upon the political subdivisions of the state a pay-as-you-go system of finance. The rule is that, without the express assent of the qualified electors, municipal officers are not to incur debts for which they have not the funds to pay. Such policy entails a measure of crudity and inefficiency in local government, but doubtless the men who drafted the Constitution, having in mind disastrous examples of optimism and extravagance on the part of public officials, thought best to sacrifice a measure of efficiency for a degree of safety. The careful, thrifty citizen sometimes gets along with a crude instrumentality until he is able to purchase and pay for something better. And likewise, under the Constitution, county officers must use the means they have for making fair and equitable assessments until they are able to pay for something more efficient, or obtain the consent of those in whose interests they are supposed to act.

It must be assumed that, in prescribing the duties of the assessor and the commissioners, the Legislature was cognizant of the conditions under which these duties must be performed, and that it was not intended to require either impossibilities or a violation of the Constitution. If it was the purpose to impose upon the counties having timber lands the burden of causing them to be cruised, is it not reasonable to suppose that such an intent would have been expressed? Every member of the Legislature of 1913 doubtless knew the manner in which such lands, as well as all other property in the state, had always been assessed, and hence knew that a cruise had never been made. If the current practice had become a public scandal, or was generally understood to be inequitable, and if, therefore, it was thought to be high time that a different method should be employed, it is strange that one was not prescribed and the means provided for carrying it into effect. For example, the Legislature did see fit (Act 1913, § 34) to impose upon the assessor the duty of having prepared a plat book of his county. It also prescribed the form of such book and its contents, and authorized the payment of expense thus necessarily incurred. If a detailed cruise of timber lands was deemed to be essential, why was it not also required, with proper provision for uniform reports thereof? If cruises are to be made, it is not only important that they have the sanction of law, but that they be required of all counties, and be made and reported according to some uniform system, so that they may also serve as the basis of state equalization as well as for local purposes.

The discussion need not be further prolonged. Enough has been said to make it clear that the Legislature has not imposed upon the counties the absolute duty of cruising their timber lands, or of incurring indebtedness for that purpose. The county officers are required only to determine the full cash value of property, including timber lands, as nearly as may be practicable with the means they have. They are not obligated, nor have they the right, to overstep the constitutional limitation for the purpose merely of possibly increasing the efficiency of their service. And the county commissioners have no authority to substitute for the statutory mode of valuing property a method of their own. It follows that, the premises upon which the plaintiff rests its entire contention touching the constitutionality of the contract not being well founded, its argument falls, and the contract must be held to be void. In any other view the constitutional prohibition would in practice prove to be a mere thing of straw. If this contract can be sustained, by parity of reasoning another of like character, for a second cruise, can be made at any time. Of necessity, conditions change from year to year. Some trees are growing, and others are being cut down or otherwise destroyed, and still others are deteriorating in value. Another cruise would doubtless be of some value.

Again: It is the duty of the county commissioners to provide buildings and other facilities for the transaction of county business. Temporary quarters may be cheaply built, or rooms may be rented, and thus the county may keep within its revenues. But such provision is not so well adapted to the public need as a permanent courthouse.

Doubtless a modern building, constructed according to approved plans, would answer the purpose better, and would be more efficient than a temporary structure or rented quarters. But may the county commissioners, therefore, without asking the assent of the electors, proceed to erect such a structure, and thus impose upon the county a large indebtedness? See Bannock County v. C. Bunting & Co., 4 Idaho, 156, 37 Pac. 277; Dunbar v. Board of Co. Com., 5 Idaho, 407, 49 Pac. 409.

[6] I have not overlooked the case of Wingate v. Clatsop County, 71 Or. 94, 142 Pac. 561, nor shall I attempt to distinguish it upon unimportant differences, either of fact or of constitutional or statutory phraseology. It is to be conceded that the limitation there involved, under the construction placed upon the Oregon Constitution, is the equivalent of section 3, article 8, of the Idaho Constitution. Furthermore, as has already been made plain, I accept the view:

"That a voluntary indebtedness is one which a county is at liberty to evade or postpone until means are provided for the payment of the expenses incident thereto, while an involuntary indebtedness is a liability imposed upon a county by law, and which it is not privileged to evade or postpone."

But, with all due respect for the court, the reasoning by which the conclusion is reached that the cruising of its timber lands constituted a duty which the defendant county could not postpone, I have been wholly unable to appreciate. It seems to me to entirely break down the protection which the constitutional provision was intended to vouchsafe. The statutes of Oregon may in some respects differ from those of Idaho; I have not undertaken to analyze them. But, however that may be, to say that under the Idaho statutes the duty of cruising its timber lands is one which a county must immediately perform, and cannot postpone, would, it is thought, be contrary to both reason and experience. Though legislature after legislature has convened, the members of which have had knowledge of a contrary practice, not exceptional, but universal, and though the revenue laws have often been the subject of public discussion, and have frequently been revised and amended, and new provisions have been added imposing specific duties upon the county officers with a view to a more complete and uniform valuation, the statute books have always been, and are, silent upon the subject of cruising. If it is absolutely obligatory upon the county to incur the indebtedness for cruising its timber lands, and if the obligation is thus involuntary, and must be discharged without evasion or delay, then as a matter of course a writ of mandate should issue to the board of county commissioners of every county in the state where there is timber land, requiring an immediate cruise to be made. And yet, in so far as I am advised, no executive or administrative officer or private citizen has ever applied for such a writ. For a generation the legislative and executive departments of the government and the public at large have acquiesced in the view that there is neither constitutional nor statutory duty to incur such indebtedness. If in a county having a total revenue of less than $55,000, with ordinary and necessary expenses aggregating approximately $60,000, an additional item of expense of $63,000, incurred by the commissioners

for something which, under like conditions and similar laws, had never before been deemed to be necessary, and without which other counties, similarly situated, had gotten along for a quarter of a century, can be held to be an "ordinary and necessary expense," the citizen may very well ask what is an extraordinary or unnecessary expense, and against what sort of a transaction does the Constitution afford him protection.

The view which I have taken of the constitutional question being decisive of the case, it is unnecessary to discuss the other two defenses, which are of a technical nature.

The bill will be dismissed, with costs to the defendants.